613 F.2d 890
 102 L.R.R.M. (BNA) 2361, 198 U.S.App.D.C. 157,
87 Lab.Cas. P 11,584
 INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO and
Council of North Atlantic Shipping Associations, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO and
Council of North AtlanticShipping Associations, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Houff Transfer, Inc., Intervenor.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO and New
York ShippingAssociation, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 77-1735, 77-1758 and 78-1510.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 18, 1979.
Decided Sept. 25, 1979.
Rehearing Denied Dec. 13, 1979.
Certiorari Granted Jan. 21, 1980. See 100 S.Ct. 727.
 
 Thomas W. Gleason, New York City, for petitioner International Longshoremen's Ass'n.
 Constantine P. Lambos, New York City, with whom Donato Caruso, New York City, was on the brief, for petitioner New York Shipping Ass'n, Inc.
 Howard E. Perlstein, Atty., N.L.R.B., and Kathy L. Krieger, Atty., N.L.R.B., Washington, D.C., of the bar of the Supreme Court of the State of New York, Pro hac vice, by special leave of court, with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.
 William L. Auten, Charlotte, N.C., with whom J. W. Alexander, Jr., Charlotte, N.C., was on the brief, for intervenor Houff Transfer, Inc.
 Before WRIGHT, Chief Judge, and ROBINSON and ROBB, Circuit Judges.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 Dissenting opinion filed by Circuit Judge ROBB.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 The National Labor Relations Board (NLRB) decided in these cases one arising in the Port of New York,[1] the other in the Ports of Baltimore and Hampton Roads[2] that petitioners Council of North Atlantic Shipping Associations (CONASA), New York Shipping Association (NYSA), and International Longshoremen's Association (ILA) violated the congressional proscription of secondary boycotts.[3] Petitioners challenge the Board's rulings as inconsistent with the Supreme Court's work preservation doctrine, and the Board cross-applies for enforcement of its orders.[4]
 
 
 2
 The work preservation doctrine provides generally that efforts to preserve work for employees displaced by technological innovation are not unlawful secondary activities and that union-management contracts with the same purpose are not proscribed "hot cargo" agreements. Activities and agreements, however, that seek not to preserve the traditional work of displaced workers but to acquire work of other employees are unlawful under the congressional proscription. The question before us is whether certain rules agreed to by shipping companies and the ILA are an effort by the ILA to acquire work or merely an attempt to preserve its members' traditional responsibilities in the era of containerized shipping.
 
 
 3
 The NLRB held that petitioners were engaged in work acquisition rather than work preservation. Because we believe this judgment rests on erroneous interpretations of the Supreme Court's decisions in National Woodwork Manufacturers Ass'n v. NLRB[5] and NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters,[6] we grant the petitions for review and set aside the Board's orders. We also deny the Board's cross-applications for enforcement.
 
 I. BACKGROUND
 
 4
 The factual antecedents of the instant disputes revolve around a specific technological innovation containerization that has had a momentous impact on the loading and unloading of ocean-borne cargo.[7] Containers are large metal receptacles that can accommodate upwards of 30,000 pounds of cargo and that can be moved to and from a ship as a single unit.[8] Historically, longshoremen transported such cargo piece by piece from the hold of a ship to the pier for inbound cargo and vice versa for outbound cargo.[9] Subsequent to the advent of containerization, however, the role of longshoremen in handling cargo has been greatly reduced. It is now the case that containers can be transported to and from ships without longshoremen handling any of the boxes, crates, and packages enclosed in each container.
 
 
 5
 Containerization obviously engendered huge increases in dockside productivity. According to one estimate, the traditional method of handling cargo translated into a productivity factor of 1.4 tons per man-hour; containerization has made it possible for this figure to rise to 30 tons per man-hour.[10] This greater efficiency was only achieved, however, by transforming what was once a labor intensive chore into a largely mechanical one. Hence workers' expectations of job security have come into conflict with management's desire to increase productivity.
 
 
 6
 Congress has not enacted a statutory scheme whose specific purpose is either to prevent or to resolve disputes between management and labor over how best to accommodate technological innovations in the workplace. As with most other aspects of American industrial relations, the problem of technological innovation has been left to the system of private ordering we know as collective bargaining.[11] A complete understanding of the controversies before us, therefore, requires not only a knowledge of the specific incidents that precipitated the disputes, but also an appreciation for the adjustments to containerized shipping that have been made through the collective bargaining process in the three port cities involved in these cases.
 
 
 7
 A. Containerization in the Ports of Baltimore and Hampton Roads
 
 
 8
 CONASA represents constituent shipping associations, including the Hampton Roads Shipping Association (HRSA) and the Steamship Trade Association of Baltimore (STAB), in ports from Massachusetts to Virginia.[12] Since its formation in 1970 CONASA has bargained on behalf of its members with the ILA over certain key issues, including containerization, on a master-contract basis.[13] Prior to the formation of CONASA, North Atlantic ports generally adopted the master terms of the labor agreement for the Port of New York.[14]
 
 
 9
 Due in large measure to the controversy surrounding containerization, the negotiation in New York of the 1968 collective bargaining agreement was a bitter affair that occasioned a strike of nearly two months' duration by members of the ILA.[15] The implications of this dispute for the national economy were sufficiently far-reaching to involve mediators appointed by the President of the United States in the dispute's resolution.[16] Part of the agreement that finally emerged in 1968 was a set of rules, known as the Rules on Containers, which represented the compromise reached between management and labor on the containerization issue. The 1968 New York agreement, whose master terms were adopted that year by other ports on the North Atlantic coast, marks the first time that the Rules on Containers were included in the labor contracts in Hampton Roads and Baltimore.[17]
 
 
 10
 Containerized shipping was first introduced in Baltimore and Hampton Roads in 1965 and 1966,[18] but did not have a substantial impact on work patterns in these ports until the late 1960s and early 1970s, by which time the Rules were adopted. For example, the first crane used to move containers to and from ships was erected in Hampton Roads in 1968 or 1969.[19] And, as a further example, one major shipper, United States Lines, moved only "a handful"[20] of containers through the Port of Baltimore in 1965, about 4,000 containers in 1969, and 25,000 just a few years later in 1973.[21] Thus, although the 1968 Rules on Containers were the parties' collectively bargained response to containerization and, as such, postdated rather than antedated the advent of containerization there was in fact no significant time lag between the technological development and the parties' collectively bargained response to it.
 
 
 11
 To understand the scope of the Rules on Containers, we must first appreciate the different ways in which container loads of cargo are classified. A "consolidated full container load" (CFCL) consists of shipments consolidated into a single container whose cargo belongs to more than one consignee. A "less than trailer load" (LTL) or a "less than container load" (LCL) also refers to a container whose cargo belongs to more than one consignee. A "full shippers' load" (FSL) or "shippers' load," in contrast, is a container of cargo from one shipper to a single beneficial owner consignee.[22] The controversy in Baltimore and Hampton Roads centered on the stripping and stuffing packing and unpacking of FSL containers.
 
 
 12
 It appears that in the Ports of Hampton Roads and Baltimore, in the few years between introduction of containerized shipping and adoption of the Rules on Containers, ILA labor stripped consolidated container loads at the pier.[23] Unless ILA stripping was requested by the consignee's agent or by the stevedore, however, shippers' loads were placed by ILA labor on the pier, where truckmen would then pick up the FSL container intact either to deliver it to the beneficial owner or to store the cargo.[24] The 1968 Rules were to an extent a formalization of these work practices. The Rules provided that ILA labor at the pier was to strip and stuff consolidated container loads that came from or were destined for any person who was not the beneficial owner of the cargo and who was located within 50 miles of the port.[25] The Rules further provided that a shipping company had to pay liquidated damages for each of its containers not handled in accordance with the Rules.[26] And for each container, including FSL containers, that passed over the docks without stripping or stuffing by longshoremen, the shipper was required to pay a royalty into an ILA fund.[27]
 
 
 13
 The 1968 Rules on Containers expired with the rest of the collective bargaining agreement in 1971, at which time further labor-management conflict over the containerization issue ensued.[28] By this time CONASA was bargaining on behalf of HRSA and STAB. The ultimate compromise reached by CONASA and the ILA on containerization, after another long strike, was to retain the same rules for handling containers and for paying royalties as were embodied in the 1968 agreement, except that the 1971 agreement provided for an increase in liquidated damages for rule infractions.[29]
 
 
 14
 As can be seen, the Rules in existence from 1968 to 1974 did not in terms require that ILA labor handle FSL cargo at the pier. But the Administrative Law Judge (ALJ) found that, "(b)eginning in 1969, following the execution of the 1968 agreement, ILA longshoremen stripped full shippers' loads which were to be delivered to a warehouse for storage within a 50-mile radius of the center of the port. ILA freight handlers loaded the freight onto trucks for delivery to the warehouse."[30] Yet FSL containers whose cargo was not to be warehoused were frequently stripped by truckers at their terminals within the port area before delivery of the cargo to its beneficial owner a practice known as "shortstopping."[31] Although there is some indication that labor-management Container Committees, established to administer the Rules,[32] considered this practice a violation of the Rules by the shipper that turned over the container,[33] it is clear that most shortstopping was not detected by the Committees.[34]
 
 
 15
 In January 1973 a labor-management committee issued an interpretation of the Rules (the "Dublin Supplement") that brought shortstopped shippers' loads within the scope of the Rules.[35] Under the Supplement truckmen were permitted to haul FSL containers of import cargo directly to a warehouse in the port area for stripping only when the freight would be stored there for at least 30 days.[36]
 
 
 16
 The Rules on Containers included in the agreement negotiated in 1974 sought to formalize practice with respect to FSL cargo along the lines of the 1968 and 1971 agreements and the Dublin accord.[37] As the ALJ found, "Under the 1974-77 container rules, ILA labor is entitled to strip full shippers' loads, whenever such work is to be done within a 50-mile radius of the center of the port by other than the consignee's employees."[38] But FSL cargo consigned to the beneficial owner's place of business or warehoused for at least 30 days within the port area was not to be stripped by the ILA;[39] instead, the ILA would continue to receive a royalty for each container not handled by longshoremen.
 
 
 17
 Thus under the 1974 Rules, assuming that the Dublin Supplement's warehousing exception was not applicable, when employees of a trucking company before delivering FSL cargo to its beneficial owner stripped an FSL container at the company's off-pier terminal and that terminal was located within 50 miles of port, the shipping line that turned over its FSL container to the truckmen became liable for liquidated damages of $1,000 per container.
 
 
 18
 B. Containerized Shipping in the Port of New York
 
 
 19
 Containerized transport was first introduced in the Port of New York during the 1950s.[40] In New York, as in Baltimore and Hampton Roads, the general practice prior to containerization was for ILA labor to handle cargo piece by piece.[41] The longshoremen would load export cargo on pallets[42] and would unload and sort import cargo in preparation for delivery.[43] These work practices began to change in the late 1950s with the introduction of containerization. And with the challenge to existing work practices came increased labor-management conflict. Predictably, management wished to secure the efficiency gains represented by containerized shipping as soon as possible; equally predictably, the ILA wished to fulfill its members' expectations of job security.[44]
 
 
 20
 The ILA-NYSA collective bargaining agreement negotiated in 1959 was the first to contain a provision dealing with containerized shipping. At that point containerization had not yet become widespread in New York. Indeed, by one report the first fully containerized vessel was not introduced into the busy North Atlantic trade route until 1967.[45] It was nevertheless thought necessary by the parties in 1959 to achieve some level of agreement on how containerized shipping would be handled.
 
 
 21
 The 1959 collective bargaining agreement expressly recognized the right of shippers belonging to the NYSA to use containers of any kind or size without ILA restrictions that would cause the containers to be stripped and restuffed at the pier.[46] There were, however, two caveats. First, the NYSA agreed to make royalty payments to a jointly administered fund for each shippers' load container that was stuffed or stripped away from the pier by non-ILA labor.[47] Second, the agreement also stipulated that
 
 
 22
 (a)ny work performed in connection with the loading and discharging of containers for employer members of the NYSA which is performed in the Port of Greater New York whether on piers or terminals controlled by them, or whether through direct contracting out, shall be performed by ILA labor at longshore rates.[48]
 
 
 23
 Applying these terms to actual dockside disputes proved to be an arduous process fraught with difficulties. In particular, the language of the second caveat was sufficiently imprecise to require a clarification which, according to the NYSA, was issued by that shippers' association on February 28, 1962:
 
 
 24
 Where an employer member of NYSA supplies a container which is the property of such member, to a consolidator for loading or discharging of cargo in the Port of Greater New York, it will be stipulated that such container must be loaded or unloaded by ILA at longshore rates.[49]
 
 
 25
 As the 1960s passed, containerized shipping in the Port of New York became more widespread and ILA hostility to the innovation more pronounced. With the 1968 negotiations looming, the ILA, at its 1967 convention, assumed a hard-line position on containerization: All containers were to be stuffed and stripped by ILA labor at long-shore rates,[50] or there was to be trouble. And trouble there was. The prolonged strike, mentioned above in the context of the situations in Baltimore and Hampton Roads, ensued and was terminated only after the appointment of a Presidential Board of Inquiry pursuant to the national emergency provisions of the Taft-Hartley Act.[51] The compromise ultimately struck between the parties was the same Rules on Containers that were adopted as master terms in Baltimore and Hampton Roads. Shippers' loads and other containers that came from or went to points 50 or more miles from the Port of New York were not subject to ILA stuffing or stripping requirements.[52] CFCL, LTL, and LCL containers to be stuffed or stripped within 50 miles of port the containers at issue in this New York case were, however, to be stuffed or stripped by ILA labor.[53]
 
 
 26
 The seemingly chronic dockside labor problems attributable to containerization continued to flare up. The 1971 collective bargaining agreement left intact the Rules adopted in 1968, but this compromise was agreed upon only after another long strike.[54] Further discord ensued, and the ILA and CONASA, which by this time had begun bargaining for the NYSA on matters pertaining to containerization, issued their Dublin Supplement in 1973 dealing with FSL containers and warehousing in the port area.[55] The collective bargaining agreement adopted in 1974 also included Rules on Containers, the final version of which manifested an intention to carry on the agreement reached in 1968 and 1971 along with the Dublin accord.[56]
 
 
 27
 C. The Role of Truckers and Consolidators Before and After the Advent of Containerized Shipping
 
 
 28
 The charging parties before the NLRB were the following common carriers: Houff Transfer, Inc. (Houff) and Associated Transfer, Inc. (Associated) in the case originating in Baltimore and Hampton Roads, and Dolphin Forwarding, Inc. (Dolphin) and San Juan Freight Forwarders, Inc. (San Juan) in the case originating in New York.[57] Because these charging parties alleged that secondary activities of the ILA and of CONASA and its members, including the NYSA, threatened to deprive them of part of their traditional work, we must briefly review what their traditional role has been with respect to the cargo at issue.
 
 1. Baltimore and Hampton Roads
 
 29
 Houff and Associated are ICC-licensed interstate common carriers whose work includes transporting cargo by truck to and from the Ports of Baltimore and Hampton Roads.[58] Both carriers have terminals within 50 miles of the Port of Hampton Roads, and Houff has a terminal in Baltimore.[59] Prior to containerization, Houff, Associated, and other trucking companies made trips to the piers in Baltimore and Hampton Roads to pick up loose cargo which had been unloaded and sorted by ILA labor.[60] The cargo would then be transported by the trucking companies to their trucking stations, to their warehouses, or directly to the consignee.
 
 
 30
 Since the advent of containerization in these ports, about 1965, truckmen regularly have transported FSL container loads to beneficial owner consignees both within and beyond 50 miles of the Ports of Baltimore and Hampton Roads.[61] Prior to adoption of the 1968 collective bargaining agreement, which was the first in Baltimore and Hampton Roads to speak to the containerization issue, truckmen also picked up FSL containers at the pier, unstripped by ILA labor, and transported them to a nearby warehouse for stripping and storing.[62] Subsequent to the Rules' adoption in 1968, FSL containers whose cargo was to be stripped and warehoused in the port area were stripped by ILA labor,[63] but truckmen frequently picked up FSL containers and stripped them at their terminals when the cargo was not to be warehoused.[64] The record indicates that at least some personnel within the trucking industry were aware that this shortstopping of FSL containers within 50 miles of the port was regarded as a violation of the Rules on Containers committed by the shippers.[65]
 
 2. New York
 
 31
 In the New York case Dolphin and San Juan employed subcontracted labor to consolidate various customers' goods by placing them into containers in preparation for shipment by sea.[66] Both companies had inland facilities within a 50-mile radius of the Port of New York.[67] The work done by Dolphin and San Juan that caused NYSA shippers to violate the Rules on Containers in the view of the Container Committee was consolidation of cargo belonging to two or more individuals into containers owned or leased by the shippers. FSL cargo is not at issue in this New York case.
 
 
 32
 Dolphin's operations antedated the adoption of the Rules on Containers by several years, although the ILA and the NYSA, as we have seen, had been negotiating over containerization since the late 1950s.[68] NYSA shippers contend that they did business with Dolphin only because Dolphin listed Massachusetts as the point of origin for the containers it filled instead of the actual point within the port area.[69] San Juan was established in 1972, several years after the Rules on Containers were first adopted.[70] The containers shipped by San Juan apparently indicated Chicago as the point of origin of the containers, although they in fact were consolidated in the New York area.[71]
 
 
 33
 D. The Incidents Precipitating the Present Disputes
 
 1. Hampton Roads
 
 34
 On September 24, 1974 Associated picked up eight FSL containers from United States Lines at a Norfolk pier and hauled them to its Virginia Beach terminal, where it stripped them.[72] Representatives of United States Lines and the ILA, upon inspection of Associated's terminal, determined that, because of Associated's shortstopping of the containers, United States Lines was in violation of the Rules on Containers.[73] The HRSA-ILA Container Committee later ratified their determination.[74] Liquidated damages of $1,000 per container were imposed on United States Lines, which demanded reimbursement from Associated.[75] Upon the refusal of Associated to comply with the demand, United States Lines severed business relations with Associated.[76]
 
 2. Baltimore
 
 35
 On September 24, 1974 Houff picked up in the Port of Baltimore two FSL containers from United States Lines and one from Lavino Shipping Company and transported them to its terminal in the Baltimore area for stripping before delivery of the cargo to the respective owners.[77] Once it was determined that this shortstopping took place, United States Lines and Lavino were assessed $1,000 per container by the STAB-ILA Container Committee, as stipulated by the Rules on Containers, and sought indemnification from Houff.[78] When the trucking company did not indemnify the two shippers, they ceased doing business with Houff.[79]
 
 3. New York
 
 36
 Dolphin and San Juan engaged in consolidation of CFCL, LCL, and LTL cargo into containers within 50 miles of the Port of New York.[80] When this practice was discovered, the NYSA shippers that had been supplying Dolphin with containers Maritime Transportation Management, Inc. (MTM) and Transamerica Trailer Transport, Inc. (TTT) were fined $4,000 and $43,000, respectively, in liquidated damages.[81] As a result of the imposition of these damages, MTM and TTT refused to furnish the consolidators with any additional containers.[82]
 
 
 37
 II. SECONDARY BOYCOTTS, WORK PRESERVATION, AND THE RULES ON CONTAINERS
 
 
 38
 The common carriers, charging parties before the NLRB, argued successfully there that certain of the Rules on Containers and efforts by the ILA to enforce those Rules violated the congressional proscription of secondary boycotts.[83] Petitioners here contend that the Rules and action supporting the Rules had a legal primary purpose work preservation and that the NLRB committed an error of law in holding otherwise. To respond to these contentions we must peruse the law of secondary boycotts, including the work preservation doctrine, and determine whether the Board applied a proper understanding of the law to the cases before us.
 
 A. The Proscription of Secondary Boycotts
 
 39
 The NLRA's proscription of secondary boycotts is premised on the distinction between primary and secondary union activity.[84] As fundamentally important as this distinction is, however, "it does not present a glaringly bright line."[85] Indeed, both the NLRB and the courts, in interpreting the congressional mandate prohibiting secondary activity, have necessarily undertaken, as Justice Frankfurter put it, the task of drawing lines "more nice than obvious."[86]
 
 
 40
 The relevant statutory provisions are Sections 8(b)(4)(B) and 8(e) of the NLRA.[87] The former once described as "surely one of the most labyrinthine provisions ever included in a federal labor statute"[88] prohibits unions and their agents from engaging in activities the object of which is forcing one employer to cease doing business with another.[89] Although the statutory language does not in terms focus on secondary activity,[90] both the legislative history[91] and a proviso that the prohibition does not apply to "any primary strike or primary picketing"[92] make clear the cardinal importance of the primary-secondary distinction. The latter provision, Section 8(e),[93] proscribes not secondary activity, but "collective-bargaining contracts whereby the employer ceases or agrees to cease doing business with any other person."[94] Although the provision literally prohibits any understanding aimed at forcing a cessation of business,[95] it is clear that this proscription of "hot cargo" agreements embodies the same distinction between lawful primary and unlawful secondary activity as Section 8(b)(4)(B), and applies only to agreements with secondary objectives.[96]
 
 
 41
 The general aim of Congress in passing these prohibitions is clear: that is, according to one commentator, "to protect neutral employers those not directly involved in a labor dispute from direct union sanctions."[97] The Senate Report accompanying the Taft-Hartley Act casts this general purpose in only slightly more specific terms: Congress sought to proscribe "a strike against employer A (the secondary employer) for the purpose of forcing that employer to cease doing business with employer B (the primary employer) * * * (with whom the union has a dispute)."[98] Unfortunately, attempts to characterize congressional intent with any more specificity have not been notably successful.[99] Nevertheless, the NLRB and the courts are required in the course of deciding cases to apply the general congressional proscription in various specific contexts:[100] in cases, for example, where there are ally employers;[101] in common situs situations;[102] in consumer picketing cases;[103] and in the context of work preservation agreements.[104] The last of these contexts is the one with which we are presented here.
 
 
 42
 B. The Supreme Court's Work Preservation Doctrine: National Woodwork And Pipefitters
 
 
 43
 An immutable feature of modern industrial economies is their dynamism. In large part this is due to the profound impact that technological advances have on the means of production. One can turn to any sector of our economy from communications to transportation to food processing and witness the blinding speed with which modern technology can alter our conception of the status quo.
 
 
 44
 It is inevitable that such rapid change will cause cleavages within a society; one example is the displacement of workers whose jobs and skills are tied to supplanted forms of technology. As mentioned earlier, there is no legislative scheme in this country designed specifically to deal with labor disputes engendered by technological innovations.[105] Such disputes instead are channeled into the system of collective bargaining; the labor relations questions raised by changes in the means of production are answered by the parties themselves rather than through state intervention.[106]
 
 
 45
 The courts in this country, including the Supreme Court, have wisely allowed for resolution of such disputes through the collective bargaining process even though the resolutions agreed to by the parties often tread perilously close to the congressional proscription of secondary boycotts.[107] The classic example of such a resolution is an agreement by the parties to preserve work for the contracting employer's employees when the nature or the location of that work has changed due to technological advances. Inescapably the effects of such agreements are felt upon employers (and their employees) other than the contracting employer. But those effects are incidental to the agreement with the contracting employer and not necessarily reflective of a secondary objective such as organizing the employees of the other affected employers. Thus under the NLRA's proscription of secondary boycotts, these work preservation agreements, as well as primary collective action enforcing their terms, are not considered illegal.[108]
 
 
 46
 The validity of such agreements under the NLRA is supported by sound policy reasons. First, it is of paramount importance that Congress, rather than imposing a solution, has chosen to allow the parties themselves to deal with labor problems generated by technological change. If the courts and the NLRB were to upset reasonable efforts by the parties to achieve some level of accommodation, this broad policy choice of Congress would be frustrated. Second, unwarranted interference by the NLRB and the courts could inject a massive dose of uncertainty into the planning functions of both management and labor. If the parties suspect that reasonable attempts to accommodate technological advances will be torn asunder by a reviewing agency or court, they will be reluctant to undertake the effort. Workers particularly could be obdurate when asked to compromise some degree of job security for the sake of efficiency if that compromise might later be cast aside. In the event of industrial disruption caused by such induced intransigence there would be no winners: not only would the workers lose work, but also the efficiency gains represented by the innovation would needlessly, if perhaps temporarily, be lost to management and to our national economy.
 
 
 47
 Two major Supreme Court cases control our understanding of the legality of work preservation agreements under the NLRA. The first is National Woodwork Manufacturers Ass'n v. NLRB,[109] a case in which a provision in a collective bargaining agreement was challenged under Section 8(e).[110] The contested clause stipulated that bargaining unit employees (carpenters) would not handle any doors that were "pre-fitted," I.e., made ready for installation prior to shipment to the jobsite.[111] The object of this provision, according to the Administrative Law Judge, the Board, and ultimately the Supreme Court, was preservation of the fitting work performed traditionally by onsite carpenters.[112]
 
 
 48
 In upholding the provision the Court expounded upon the nature of the inquiry that courts and the NLRB must undertake when determining the legality of such agreements. "The determination * * * cannot be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for (the contracting employer's) employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere."[113] The Court continued: "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer Vis-a-vis his own employees."[114] As one commentator has written of National Woodwork, "Since the object of the union was to preserve work for unit employees, and since it had no quarrel with the Union status or other personnel relations of the door manufacturer, the contract provision was upheld."[115]
 
 
 49
 In a case decided in 1977 the Supreme Court once again confronted the work preservation issue, but with a different result. In NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters,[116] the Court refused to approve union activity in support of what appeared to be a work preservation clause. In Pipefitters a subcontractor on a construction project had agreed to the contested clause in its labor agreement with its steamfitter employees. Under the clause all pipe threading and cutting were to be performed on the jobsite by the steamfitters, who had traditionally performed this work.[117] This provision notwithstanding, the main contractor decided, and the subcontractor agreed, to order pre-threaded and pre-cut pipes for the job. The steamfitters refused to install the pipes, and a work disruption ensued.[118]
 
 
 50
 The NLRB, confronted with this factual situation, found that the contested clause had a primary purpose work preservation[119] but that the union's activity to enforce the agreement did not.[120] The NLRB's holding was premised on its "right to control" test, which is based on the determination whether the coerced employer in Pipefitters, the subcontractor could "control," I.e., award, the work sought by the union.[121] If the coerced employer cannot control the work, then it follows that the union's actions are directed not at this employer, but at another employer who in fact does control the work. In Pipefitters the object of the strike was to obtain work controlled not by the subcontractor, with whom the steamfitters had agreed to the lawful work preservation clause, but by the main contractor; in the Board's view this meant that the object of the boycott was secondary.[122]
 
 
 51
 The decision of the NLRB was set aside on appeal by this court,[123] but the Supreme Court reversed our decision.[124] In so doing the Supreme Court was exceedingly careful to cast its decision in terms of its reasoning in National Woodwork. As the Court discerned the issue in Pipefitters, for example, it turned on "whether the boycott was 'addressed to the labor relations of the contracting employer Vis-a-vis his own employees.' "[125] This formulation of the issue corresponded to the Court's view of the scope of Section 8(e), which also came from National Woodwork. The provision "does not prohibit agreements made for 'primary' purposes, including the purpose of preserving for the contracting employees themselves work traditionally done by them."[126]
 
 
 52
 In holding that the strike in Pipefitters was unlawful secondary activity, the Supreme Court affirmed several points of law that merit reiteration here. First, the Court supported National Woodwork's admonition that courts and the NLRB examine "all the surrounding circumstances"[127] when assessing the validity of a work preservation clause.[128] Second, the Court also affirmed National Woodwork's insistence that to be considered a legal attempt at work preservation the challenged boycott must focus on the "labor relations of the contracting employer Vis-a-vis his own employees."[129] Third, the Court held that a provision in a collective bargaining agreement cannot itself immunize union activity that otherwise is secondary in character.[130] Fourth, the NLRB, according to the Court, was perfectly within the law in applying its right to control test as a means of delineating the scope of lawful primary activity.[131] Fifth, the Court reaffirmed that where the NLRB's decision is based on a proper understanding of the prevailing law, appellate review is confined to a determination of "whether the Board's findings were 'supported by substantial evidence on the record considered as a whole.' "[132]
 
 
 53
 Before applying these legal standards to the cases before us, we must make a brief excursus into the litigation history of the Rules on Containers.
 
 C. The Rules on Containers in the Courts
 
 54
 The Rules on Containers have been the subject of extensive litigation over the past decade. The Second Circuit was the first Court of Appeals to adjudge the validity of the Rules when, in Intercontinental Container Transport Corp. v. New York Shipping Association (ICTC),[133] a consolidator challenged the Rules as a conspiracy in restraint of trade and hence as violative of the Sherman Act.[134] To decide whether the Rules amounted to an antitrust violation the court had to determine whether the union's activities of bargaining for and enforcing the Rules fell within the labor exemption to the Sherman Act.[135] This determination rested in part on "whether the action is in the union's self-interest in an area which is a proper subject of union concern."[136]
 
 
 55
 The court had little difficulty in finding that the Rules were in the interest of the union and its members. Noting that the Supreme Court has repeatedly held that preservation of jobs is within the area of proper union concern,[137] the court concluded that "(t)he (Rules) have as their object the preservation of work traditionally performed by longshoremen covered by the agreement."[138] Rather than aiding a group of businessmen to violate the Sherman Act, "the union here, acting solely in its own self-interest, forced reluctant employers to yield to certain of its demands."[139] The agreement between management and labor on the containerization issue was held within the labor exemption to the antitrust laws.
 
 
 56
 After the Second Circuit's decision in ICTC, unfair labor practice charges were filed against the ILA and the NYSA by two off-pier consolidators that operated near the Port of New York. The charges alleged that the Rules on Containers were an agreement to engage in a secondary boycott a "hot cargo" agreement contrary to the NLRA[140] and that enforcement of the Rules by the ILA was also violative of the Act's proscription of secondary boycotts.[141] The Administrative Law Judge assigned to the case upheld the Rules as valid work preservation clauses, but he was reversed by the NLRB.[142] The ILA and the NYSA sought review of the NLRB's decision in the Second Circuit, which, in International Longshoremen's Ass'n v. NLRB (Conex),[143] affirmed the Board.
 
 
 57
 The court noted its previous decision in ICTC, but found the holding in that case distinguishable because ICTC arose in an antitrust context.[144] In Conex, by contrast, the court believed that a measure of deference was owed the NLRB and that this factor allowed it to affirm the Board without directly overruling its decision in ICTC.[145] The NLRB, in reviewing the claim of the ILA and the NYSA that the Rules were valid under the Supreme Court's work preservation doctrine enunciated in National Woodwork, had found that the work at issue was not the loading and unloading of ships, the traditional work of the ILA, but the off-pier stripping and stuffing of containers.[146] In the relatively few years since the advent of containerization, off-pier stripping and stuffing of containers had been performed by the employees of consolidators; hence the ILA was really engaged in work acquisition rather than work preservation.[147] This conclusion, according to the divided Second Circuit panel, was "supported by substantial evidence and by sound analysis."[148] The Board's order thus was enforced.
 
 
 58
 The First Circuit, in International Longshoremen's Ass'n v. NLRB,[149] reached a conclusion similar to that of the Second Circuit in Conex. The panel was presented with a dispute apparently generated by an expansive interpretation of the Rules by a Puerto Rican local of the ILA, Local 1575. Although observing that Conex was "strikingly similar" to its case,[150] the First Circuit went on to note that "(t)he fact situation we face presents a slightly stronger case for enforcement under National Woodwork than did the situation considered by the Second Circuit."[151] The NLRB had found that Local 1575 wished to apply the Rules not only so that any consolidating work would be done by ILA labor at the pier, but also so that members of the local would displace the non-union employees at the consolidator's facilities.[152] Hence the union, through its local, had manifested an interest not only in work preservation, but also in union organization of the excluded employer. The union's interest in the labor relations of the excluded employer was in itself sufficient to make National Woodwork's work preservation exception to secondary boycotts inapposite.[153] Again, the Board's order was enforced.[154]
 
 
 59
 The Rules on Containers also have been reviewed by the Fourth Circuit in a case arising out of the instant proceeding in the Port of Hampton Roads. In Humphrey v. International Longshoremen's Ass'n,[155] that circuit vacated and remanded the District Court's order denying a temporary injunction sought by the Regional Director of the NLRB under 29 U.S.C. § 160(L ) (1976).[156] The District Court had held that the NLRB did not have reasonable cause to believe that the Rules violated the NLRA.[157] The Fourth Circuit, however, found that the District Judge had erred because the work in controversy was not the ILA's traditional work of loading and unloading ships, but the off-pier work of stripping and stuffing containers.[158] Consequently, the court "conclude(d) that (the NLRB) ha(d) ample reasonable cause to believe that appellees are violating the Act."[159] The court ordered that on remand the District Court enter the appropriate injunction.
 
 
 60
 D. Work Preservation and the Rules on Containers
 
 
 61
 Under the Rules on Containers included in the 1974-1977 collective bargaining agreement, ILA labor was entitled to strip and stuff FSL containers whenever that work would otherwise be done within 50 miles of port by workers other than the employees of the cargo's beneficial owner.[160] Houff and Associated complained to the NLRB that this provision and its enforcement by the ILA in the Ports of Baltimore and Hampton Roads allowed ILA labor to acquire work of Houff and Associated rather than to preserve work for members of the ILA. Also under the 1974-1977 Rules, ILA labor was entitled to stuff and strip all LCL, LTL, and CFCL containers that originated or terminated within 50 miles of port.[161] Dolphin and San Juan complained to the NLRB that this provision and its enforcement by the ILA in the Port of New York served to acquire work traditionally done by Dolphin and San Juan rather than to preserve work for members of the ILA. To decide whether the NLRB's receptivity to these charges was well founded, we must apply the teaching of National Woodwork and Pipefitters to the NLRB's decisions.[162]
 
 1. All the surrounding circumstances
 
 62
 Did the Board, in characterizing the challenged Rules as work acquisition rather than work preservation clauses, examine "all the surrounding circumstances"?[163] When defining the work in controversy the first step in determining whether the union was engaged in work preservation or work acquisition[164] the Board settled on off-pier stripping and stuffing of containers.[165] Because longshoremen have always done their work on the piers, the Board reasoned, they could not traditionally have performed the work in controversy.[166] Instead, employees of consolidators and trucking companies with off-pier terminals did the work of stuffing and stripping containers away from the pier.[167] Hence for ILA labor to lay claim to this work amounted to work acquisition rather than to preservation of traditional ILA work.[168]
 
 
 63
 This formulation of the work in controversy, however, could not reasonably have been based on "all the surrounding circumstances" as required by National Woodwork and Pipefitters.[169] When a technological innovation is introduced in the workplace, new work may be created and may initially be performed, as in these cases, by employees other than those who worked with the old technology. The crucial question is how best to rationalize the work that results from the innovation into traditional work patterns. As a rule, this cannot be done by ignoring those traditional work patterns when defining the work in controversy. But that is precisely what the NLRB has done here. Rather than define a category of work based on work patterns both prior and subsequent to the innovation, the Board has defined the work in controversy specifically in terms of the innovation, thus By definition removing any opportunity for pre-innovation workers to preserve their work. Under such a formulation the Supreme Court's work preservation doctrine is sapped of all life.[170]
 
 
 64
 There may be cases, of course, in which work engendered by the technological innovation is so different in character from the traditional work that claims based on that traditional work can rightly be discounted, even ignored. But we are not presented with such a case here. The overriding similarities between the traditional work of longshoremen and the work of stuffing and stripping containers are evident.[171] Longshoremen have historically loaded and unloaded ocean-borne cargo, which not only has meant loading the cargo into and out of the hold of the ship, but also has meant sorting the cargo and loading it on to equipment such as pallets.[172] From the longshoremen's standpoint, therefore, containerization merely represents a change in equipment.[173]
 
 
 65
 Further, the very nature of containers belies any notion that they present work distinctly different from and unrelated to traditional longshoremen's work. As Judge Friendly recently observed in another context, "Stripping a container of goods destined to different consignees is the functional equivalent of sorting cargo discharged from a ship; stuffing a container is part of the loading of the ship even though it is performed on shore and not in the ship's cargo holds."[174] The Supreme Court, in affirming Judge Friendly's observations, wrote of containerization: "In effect, the operation of loading and unloading has been moved shoreward; the container is a modern substitute for the hold of the vessel."[175] The correspondence between the shift to containerized shipping and the sharp reduction in employment opportunities for longshoremen bears witness to the wisdom of these observations.[176]
 
 
 66
 We hold that the NLRB committed reversible legal error by ignoring circumstances crucial to responsible application of the Supreme Court's work preservation doctrine enunciated in National Woodwork and Pipefitters. If the NLRB cannot, as it has not in these cases, establish that the new work is sufficiently unrelated to the old work to present a clear break with the past, it must not ignore traditional work patterns when defining the work in controversy. In this case proper consideration of the relevant work patterns both prior and subsequent to the advent of containerization might have led to a different categorization for the work in controversy. The loading and unloading of ocean-borne cargo, with its directly related peripheral tasks such as sorting cargo, is an example of one possible categorization.[177] It is the province of the NLRB to settle upon the correct categorization, of course, and we offer no opinion on the proper one. We simply hold that the Board erred as a matter of law by ignoring traditional work patterns when defining the work in controversy.[178]
 
 
 67
 2. Whose labor relations?
 
 
 68
 National Woodwork instructed us, and Pipefitters reinstructed us, that to be classified as work preservation a boycott must be focused on the "labor relations of the contracting employer Vis-a-vis his own employees."[179] The boycott must not be "tactically calculated to satisfy union objectives elsewhere."[180]
 
 
 69
 Ever since containerized shipping was first introduced in New York, Baltimore, and Hampton Roads, it has been a hotly debated item between shippers and their associations (CONASA, NYSA, STAB, HRSA, etc.), on the one hand, and the ILA on the other.[181] Indeed, containerization bears primary responsibility for months of work stoppages by ILA members infuriated by actions of shippers with respect to containerization.[182] The Rules on Containers and activities seeking to enforce the Rules are directly traceable to the collective bargaining relationship between the shippers and the ILA and to the efforts of the parties, within the confines of that relationship, to adjust to an extremely thorny industrial issue: technological innovation versus job security. Nowhere has it been established, or even intimated, that the ILA, perhaps with a view to organization, was attempting to focus its boycott on the labor relations of the trucking companies and the consolidators.[183] Those employers were affected by the boycott, to be sure, as were their employees. But we must distinguish between the incidental effects of primary activity, on the one hand, and a secondary purpose on the other. The former are allowable under the national labor laws,[184] and there has been no convincing showing by the NLRB that the latter exists. The challenged boycott unquestionably focused on the "labor relations of the contracting employer Vis-a-vis his own employees."[185]
 
 
 70
 3. The effect of the Rules on the legality of union activity
 
 
 71
 Under Pipefitters a work preservation agreement does not itself immunize secondary activity from the effects of the congressional proscription of secondary boycotts.[186] Neither the NLRB nor this court relies on this thesis, hence this issue is not raised.
 
 4. The right to control test
 
 72
 In Pipefitters the Supreme Court resolved a dispute among the circuits by affirming the validity of the Board's right to control test as a means of delineating primary activity.[187] Under this test an employer subjected to an industrial sanction by his employees must be able to control the disposition of the work sought by those employees for their activity to be considered primary.[188] The Court held that this test was an acceptable gloss on the congressional proscription of secondary boycotts.[189]
 
 
 73
 Ironically, after defending use of this test in circuit after circuit and finally vindicating its use in the highest court in the land, the NLRB's posture in the cases before us is not supported by rational application of the right to control test. CONASA and NYSA shippers the employers of the boycotting ILA members in these cases, and the coerced employers under Pipefitters controlled the disposition of all the containers at issue.[190] Indeed, according to the Board the Rules reach no containers except those owned or leased by the shippers.[191] Thus when the relevant Container Committees found the shippers in violation of the Rules and fined them, the shippers, after unsuccessfully seeking indemnification from the truckers and consolidators, simply refused to supply their containers to the truckers and consolidators so that the Rules would be complied with that is, so that ILA labor would do the work if the work were to be done. It is difficult to imagine a more forceful demonstration of control.[192]
 
 5. The substantial evidence standard
 
 74
 The Pipefitters Court made abundantly clear that under the NLRA,[193] courts reviewing NLRB decisions are bound by the Board's factual findings if supported by substantial evidence on the record considered as a whole.[194] But the salient facts underlying the cases before us are not in dispute. This is the fourth circuit to adjudge the validity of the Rules on Containers or of action seeking to enforce the Rules, and the factual backgrounds of these cases overlap to a significant degree.[195] As the NLRB forthrightly observed with respect to the instant case arising in Baltimore and Hampton Roads. "(P) etitioners' real complaint is with the Board's analytic framework not its findings of fact,"[196] a characterization in which the petitioners heartily concur.[197] And as to the New York case, the Board commented that its
 
 
 75
 decision in Conex is controlling. The Conex case involved the identical Respondents (NYSA and ILA) and dealt with the same Rules on Containers. The charging parties in Conex were also consolidating companies engaged in off-pier stripping and stuffing of containers. * * *[198]
 
 
 76
 In Conex Judge Wyzanski, who wrote the majority opinion affirming the NLRB, stated that "(t)here is no dispute as to the objective facts in this case."[199]
 
 
 77
 Like the petitioners and the other circuits, this court has no dispute with the Board's factual findings. Rather, our conflict with the NLRB is exclusively focused on the Board's misinterpretation and misapplication of the prevailing law the doctrine of work preservation.[200] The Supreme Court has consistently maintained that NLRB rulings should not be sustained by reviewing courts where those rulings rest on "erroneous legal foundations."[201] The NLRB's decisions before us are of such a character, and thus reversal is warranted.[202]III. CONCLUSION: CONTAINERIZATION AND THE NATIONAL LABOR POLICY
 
 
 78
 The relationship between the ILA and CONASA shippers has been under continual strain over the past two decades due to containerization.[203] Their relationship has survived prolonged negotiations, presidential intervention, and the occasional use of economic force.[204] The result of their efforts is the Rules on Containers. These Rules represent a reasoned response to the difficult problem of technological innovation and are an exemplar of the self-government contemplated by Congress when it left the bulk of industrial problems to be resolved in the private sector.[205] The Rules seek neither to stymie technological innovation nor to introduce manual labor in situations where the work otherwise would be handled by more efficient mechanized means;[206] rather, the Rules intend to secure for ILA labor any stripping and stuffing of containers that is to be performed within 50 miles of port by other than the employees of the cargo's beneficial owner. Courts and the NLRB must take great care not to disturb the parties' reasoned attempts at self-governance unless those attempts contravene the law. For the reasons stated in this opinion, we believe that the NLRB has failed to demonstrate that the Rules on Containers and action seeking to enforce the Rules are in contravention of the law. Accordingly, the NLRB's decisions in these cases are vacated, and its cross-applications for enforcement are denied. We remand to the NLRB for any further proceedings it deems appropriate.
 
 
 79
 So ordered.
 
 APPENDIX A
 1968 Hampton Roads Rules on Containers
 I. CONTAINERIZATION
 
 80
 Containers owned or leased by Employer-signatory members (including containers on wheels) containing LTL loads or consolidated full-container loads, which are destined for or come from, any person (including a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder, who is either a consolidator of outbound cargo or a distributor of inbound cargo) who is not the beneficial owner of the cargo, and which either comes from or is destined to any point within a 50-mile radius from the center of any North Atlantic District port shall be stuffed and stripped by ILA longshore labor at longshore rates on a waterfront facility under the terms and conditions of the General Cargo Agreement. (Rules on Containers are listed below.)
 
 II. RULES ON CONTAINERS
 
 81
 The following provisions are intended to protect and preserve the work jurisdiction of longshoremen and all other ILA crafts at deepsea piers or terminals. To assure compliance with the collective bargaining provisions the following rules and regulations shall be applied.
 
 
 82
 A. Definitions and Rule as to Containers Covered
 
 
 83
 Stuffing means the act of placing cargo into a container
 
 
 84
 Stripping means the act of removing cargo from a container
 
 
 85
 Loading means the act of placing containers aboard a vessel
 
 
 86
 Discharging means the act of removing containers from a vessel.
 
 
 87
 These provisions relate solely to containers meeting each and all of the following criteria:
 
 
 88
 1. Containers owned or leased by employer-signatory members (including containers on wheels) which contain LTL loads or consolidated full container loads.
 
 
 89
 2. Such containers which come from or go to any person (including a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder, who is either a consolidator of outbound cargo or a distributor of inbound cargo) who is not the beneficial owner of the cargo.
 
 
 90
 3. Such containers which come from or go to any point within a geographical area of any port in the North Atlantic District described by a 50-mile circle within its radius extending out from the center of each port. It is understood that the center of Hampton Roads will be defined as Middle Ground Light.
 
 
 91
 B. Rule of Stripping and Stuffing Applied to Such Containers
 
 
 92
 A container which comes within each and all of the criteria set forth in "A" above shall be stuffed and stripped by ILA longshore labor. Such ILA labor shall be paid and employed at longshore rates under the terms and conditions of the General Cargo Agreement. Such stuffing and stripping shall be performed on a waterfront facility, pier or dock. No container of cargo shall be stuffed or stripped by ILA longshore labor more than once. Notwithstanding the above provisions, LTL loads or consolidated container loads of mail, of household goods with no other type of cargo in the container, and of personal effects of military personnel shall be exempt from the rule of stripping and stuffing.
 
 C. Rules on No Avoidance or Evasion
 
 93
 The above rules are intended to be fairly and reasonably applied by the parties. To obtain non-discriminatory and fair implementation of the above, the following principles shall apply.
 
 
 94
 1. Agreement in the Port as to the geographic area as provided in "A (3)" is based on present LTL movement patterns in the port. Should any person, firm or corporation, for the purpose of evading the provisions of "B" hereof, seek to change such pattern by shifting its operations to, or commencing new operations at, a point outside agreed-upon geographic area, then either party may raise the question whether said point should be included within the said geographic area, and upon agreement that the purpose of the shift in its operations was to evade the provisions of "B", then said point shall be deemed to be within the said geographic area for the purpose of these rules.
 
 
 95
 2. Containers owned or leased by companies which are affiliated either directly or through a holding company with an employer-member shall be deemed to be containers owned or leased by employer-members. Affiliation shall include subsidiaries and/or affiliates which are effectively controlled by the employer-member, its parent, or stockholders of either of them.
 
 
 96
 3. It shall be the obligation of employer-members to clearly mark each container's documentation as to whether or not it is an "A" container which is to be stuffed and stripped at the waterfront facility (pier or dock).
 
 
 97
 4. Each employer-member shall keep records of each container supplied to a consolidator or other non-owner of cargo, located within the agreed geographic area, and such record shall be available to the Committee provided in (7) below. With respect to all containers received at or delivered from the vessel, a record of the same shall be made by ILA Checkers or Clerks.
 
 
 98
 5. Failure to stuff or strip a container as required under these rules will be considered a violation of the contract between the parties. Use of improper, fictitious or incorrect documentation to evade the provisions of "B" shall also be considered a violation of the contract. If for any reason a container is no longer at the waterfront facility at which it should have been stuffed or stripped under the rules then the steamship carrier found guilty of intent to cause improper, fictitious, or incorrect documentation to evade the provisions of "B" above shall pay to the joint Welfare Fund $150.00 per container which should have been stuffed or stripped.
 
 
 99
 6. If any shippers or their agents who have at any time used, are now using, or in the future use containers owned or leased by employer-members, hereafter use containers not owned or leased by employer-members, for the purpose of evading the provisions of "B" hereof, then the containers so used shall be considered to be within "A" and "B".
 
 
 100
 7. A committee represented equally by management and Union shall be formed and shall have the responsibility and power to hear and pass judgment on any violations of these rules. Any inability to agree shall be processed as a grievance under the applicable contract except as limited by "C (8)" hereof.
 
 
 101
 8. If the purpose of protecting and preserving the present work jurisdiction of longshoremen and all other deepsea ILA crafts over any containers loaded with LTL cargo, or consolidated full container loads as defined herein is not accomplished by the provisions of these rules on containers, then either party shall have the right to renegotiate these provisions or any part thereof by giving notice to the other party. This provision shall not be subject to arbitration. Pending renegotiation and settlement of the given dispute, the employees may decline to work the specific containers involved in the dispute and such refusal to work shall not be subject to arbitration. The renegotiation referred to above will not be subject to arbitration. Interpretation of this provision shall not be determined by an arbitrator but by a court of competent jurisdiction.
 
 APPENDIX B
 1974 Rules on Containers
 CONASA-ILA RULES ON CONTAINERS
 PREAMBLE
 
 102
 This Agreement made and entered into by and between the carrier and direct employer members of the CONASA Port Associations (hereinafter referred to collectively as "CONASA") and the International Longshoremen's Association, AFL-CIO ("ILA"), its Atlantic Coast District ("ACD") and its affiliated local unions in each CONASA port ("locals") covers all container work at a waterfront facility which includes but is not limited to the receiving and delivery of cargo, the loading and discharging of said cargo into and out of containers, the maintenance of containers, and the loading and discharging of containers on and off ships.
 
 
 103
 CONASA agrees that it will not directly perform work done on a container waterfront facility (as hereinafter defined) or contract out such work which historically and regularly has been & currently is performed by employees covered by CONASA-ILA Agreements, including CONASA-ILA craft agreements, unless such work on such container waterfront facility is performed by employees covered by CONASA-ILA Agreements.RULES
 
 
 104
 The following provisions are intended to protect and preserve the work jurisdiction of longshoremen and all other ILA crafts which was performed at deepsea waterfront facilities. These rules do not have any effect on work which historically was not performed at a waterfront facility by deepsea ILA labor. To assure compliance with the collective bargaining provisions, the following rules and regulations shall be applied uniformly in all CONASA Ports to all import or export cargo in containers:
 
 Definitions
 
 105
 (a) Loading a Container means the act of placing cargo into a container.
 
 
 106
 (b) Discharging a Container means the act of removing cargo from a container.
 
 
 107
 (c) Loading Containers on a vessel means the act of placing containers aboard a vessel.
 
 
 108
 (d) Discharging Containers from a vessel means the act of removing containers from a vessel.
 
 
 109
 (e) Waterfront facility means a pier or dock where vessels are normally worked including a container compound operated by a carrier or direct employer.
 
 
 110
 (f) Qualified Shipper means the manufacturer or seller having a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the export cargo being transported and who is named in the dock/cargo receipt.
 
 
 111
 (g) Qualified Consignee means the purchaser or one who otherwise has a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the import cargo being transported and who is named in the delivery order.
 
 
 112
 (h) Consolidated Container Load means a container load of cargo where such cargo belongs to more than one shipper on export cargo or one consignee on import cargo.
 
 
 113
 Rule 1 Containers To Be Loaded or Discharged by Deepsea ILA Labor
 
 
 114
 (a) Cargo in containers referred to below shall be loaded into or discharged out of containers only at a waterfront facility by deepsea ILA labor:
 
 
 115
 (1) Containers owned, leased or used by carriers (including containers on wheels and trailers), hereinafter "containers", which contain consolidated container loads, which come from or go to any point within a geographic area of any CONASA port described by a 50-mile circle with its radius extending out from the center of each port. (hereinafter "geographic area") or
 
 
 116
 (2) Containers which come from a single shipper which is not the manufacturer ("manufacturer's label") into which the cargo has been loaded (consolidated) by other than its own employees and such containers come from any point within the "geographic area," or
 
 
 117
 (3) Containers designated for a single consignee from which the cargo is discharged (deconsolidated) by other than its own employees within the "geographic area" and which is not warehoused in accordance with Rule 2(B).
 
 
 118
 (b) Such ILA labor shall be paid and employed at deep-sea longshore rates under the terms and conditions of the deep-sea ILA labor agreement in each CONASA port, including the provisions for all fringe benefits and any and all other benefits receivable by deep-sea ILA craft workers in each such Port. No cargo shall be loaded into or discharged out of any container by ILA deep-sea labor more than once.
 
 
 119
 (c) All export consolidated cargo, described in 1(a) (1) and (2) above, shall be received at the waterfront facility by deep-sea ILA labor and such cargo shall be loaded into a container at the waterfront facility for loading aboard ship.
 
 
 120
 (d) All import consolidated cargo, described in 1(a) (1) and (3) above, shall be discharged from the container and the cargo placed on the waterfront facility where it will be delivered and picked up by each consignee.
 
 
 121
 (e) No carrier or direct employee shall supply its containers to any consolidator or de-consolidator. No carrier or direct employer shall operate a facility in violation of the Rules on Containers which specifically require that all Rule 1 Containers be loaded or discharged at a waterfront facility.
 
 
 122
 Rule 2 Containers Not to be Loaded or Discharged by ILA Labor
 
 
 123
 Cargo in containers referred to below shall not be loaded or discharged by ILA labor:
 
 A. Export Cargo:
 
 124
 (1) All cargo loaded in containers outside the "geographic area".
 
 
 125
 (2) Containers loaded with cargo at a qualified shipper's facility with its own employees.
 
 
 126
 (3) Containers loaded with the cargo of a single manufacturer (manufacturer's label).
 
 
 127
 (4) Consolidated container loads of mail, household effects of a person who is relocating his place of residence, with no other type of cargo in the container, or personal effects of military personnel.
 
 
 128
 B. Import Cargo;
 
 
 129
 (1) All cargo discharged from containers outside the "geographic area".
 
 
 130
 (2) Containers discharged at a qualified consignee's facility by its own employees.
 
 
 131
 (3) Consolidated container loads of mail, household effects of a person who is relocating his place of business, with no other type of cargo in the container, or personal effects of military personnel.
 
 
 132
 (4) Containers of a qualified consignee discharged at a bona fide public warehouse within the "geographic area" which comply with all of the following conditions.
 
 
 133
 1. The container cargo is warehoused at a bona fide public warehouse.
 
 
 134
 2. The qualified consignee pays the normal labor charges in and out; and the normal warehouse storage fees for a minimum period of thirty or more days, and;
 
 
 135
 3. The cargo being warehoused (a) in the normal course of the business of the qualified consignee; (b) title to such goods has not been transferred from the qualified consignee to another.
 
 
 136
 The carrier on request will furnish all documentation and other information which permits the Container Committee in the port to determine whether conditions 1, 2 and 3 have been met. This exception shall not apply where cargo is warehoused for the purpose of avoidance or evasion of Rule 1. It is limited to containers warehoused as provided in the above conditions and any warehouse which does not conform to such conditions shall be deemed a consolidator or de-consolidator.
 
 Rule 3 Batching
 
 137
 When an employer-member or carrier uses a trucker to remove or deliver containers in batches, or in substantial number, from or to a terminal to another place of rest (outside of its terminal) where containers are stored pending their delivery to a consignee (or after being received from a shipper and while waiting the arrival of a ship), for the purpose of reducing the work jurisdiction of the ILA or any of its crafts, such use is deemed to be batching and an evasion of these Rules in violation of the CONASA-ILA contract.
 
 Rule 4 Headload
 
 138
 Where a single qualified shipper sends an export container which contains all of his own cargo to a waterfront facility and such container is not full, the carrier or direct employer may load this container with additional cargo at the waterfront facility. On import cargo, the carrier or direct employer may discharge any such additional cargo and send the remaining cargo in the container to the qualified consignee. The loading or discharging of cargo at ILA ports shall be performed at a waterfront facility by deepsea ILA labor.
 
 
 139
 Rule 5 Overland Movement of Containers from CONASA Port to Non-CONASA Port
 
 
 140
 If a carrier moves containers from a CONASA Port to a non-CONASA Port for the purpose of evading the Rules on Containers, the carrier is in violation of the CONASA-ILA Agreement. If the cargo is being moved to a non-CONASA-ILA Port in the normal course of business, and not for the purpose of evasion, then such movement is not a violation.
 
 
 141
 Rule 6 Importers Advertising Evasion of Rules
 
 
 142
 The circulation, in writing, by importers, of methods developed by them to evade the Rules on Containers by issuing single bills of lading on what are in fact consolidated container loads shall be deemed a violation and all CONASA-ILA Container Committees shall be advised to stop such evasion at the waterfront facilities.
 
 Rule 7 No Avoidance or Evasion
 
 143
 The above rules are intended to be fairly and reasonably applied by the parties. To obtain non-discriminatory and fair implementation of the above, the following principles shall apply:
 
 
 144
 (a) Geographic Area Agreement in the Port to the geographic area as provided in Rule 1 is based on present consolidated movement patterns in the port. Should any person, firm or corporation for the purpose of evading the provisions of the Rules on Containers, seek to change such pattern by shifting its operations to, or commencing new operations at, a point outside said agreed upon geographic area, then either party may raise the question whether said point should be included within the said geographic area, and upon agreement that the purpose of the shift in its operations was to evade the provisions of the Rules on Containers, then said point shall be deemed to be within the said geographic area for the purpose of these rules.
 
 
 145
 (b) Containers Owned, Leased or Used
 
 
 146
 Containers owned, leased or used by companies which are affiliated either directly or through a holding company with a carrier or a direct employer shall be deemed to be containers owned, leased or used by a carrier or direct employer. Affiliation shall include subsidiaries and/or affiliates which are effectively controlled by the carrier or direct employer, its parent, or stockholders of either of them.
 
 
 147
 (c) Liquidated Damages Failure to load or discharge a container as required under these rules will be considered a violation of the contract between the parties. Use of improper, fictitious or incorrect documentation to evade the provisions of Rule 1 and Rule 2 shall also be considered a violation of the contract. If for any reason a container is no longer at the waterfront facility at which it should have been loaded or discharged under the Rules, then the carrier or its agent or direct employer shall pay, to the joint Container Royalty Fund, liquidated damages of $1,000 per container which should have been loaded or discharged. If any carrier does not pay liquidated damages within 30 days after exhausting its right to appeal the imposition of liquidated damages to the Committee provided in Rule 9(a) below, the ILA shall have the right to stop working such carrier's containers until such damages are paid.
 
 
 148
 (d) Any facility operated in violation of the Container Rules will not have service supplied to it by any direct employer and the ILA will not supply labor to such facility.
 
 
 149
 Rule 8 Renegotiation and Cancellation No Arbitration
 
 
 150
 These Rules shall be in effect for the term of the CONASA-ILA Agreement, provided, however, that either party shall have the right to cancel the Rules on Containers at any time on or after December 1, 1974, on thirty (30) days written notice of a desire to renegotiate the provisions of these Rules. Negotiations shall be held during such thirty (30) day period and if the parties are unable to agree by the end of such period, these Rules shall be deemed cancelled. Thereafter, the ILA shall have the right to refuse to handle containers and CONASA shall have the right to refuse to hire employees under the said Rules. The negotiations referred to above shall, under no condition, be subject to the grievance or arbitration provisions of any CONASA-ILA Agreement.
 
 
 151
 Rule 9 Enforcement of the Rules on Containers
 
 
 152
 To assure effective, fair and non-discriminatory enforcement of the above Rules, the following regulations shall apply:
 
 
 153
 (a) A Committee in each CONASA port represented equally by management and union shall be formed and shall have the responsibility and power to hear and pass judgment on any violations of these Rules. Any inability to agree shall be processed as a grievance under the applicable contract except as limited by Rule 8 hereof. A joint committee, known as the CONASA-ILA Container Committee, represented equally by management and labor and made up of representatives (to be mutually agreed upon) from each CONASA Port, namely, Boston, Rhode Island, New York, Philadelphia, Baltimore and Hampton Roads shall meet at least quarterly each year for the purpose of insuring uniformity in the interpretation of these Rules.
 
 
 154
 (b) A Committee of carriers, together with CONASA-ILA Container Committee will develop uniform documentation which shall be required to be prepared and maintained by all carriers in order to readily identify all Rule 1 containers which are subject to loading or discharging by deepsea ILA labor. It shall be the obligation of employer-members to clearly mark each container's documentation as to whether or not it is a Rule 1 container, which shall be loaded or discharged. If a container's documentation is not clearly marked, it shall be deemed a Rule 1 container and it shall be loaded or discharged by deepsea ILA labor at the waterfront facility. With respect to all containers received at or delivered from the waterfront facility, a record of the same shall be made by ILA Checkers or Clerks. All carriers will distribute to all other carriers any and all information and devices which are being used by any person to circumvent the Rules on Containers. Any carrier whose attention is brought to a violation of the Rules shall immediately cease such violation and report the matter to the appropriate CONASA-ILA Container Committee and to the policing agency provided in (e) below in its port.
 
 
 155
 (c) Every import container destined to a point within 50-miles of a CONASA Port shall be delivered only on a delivery order. Every export container coming from a point within 50-miles of a CONASA Port shall be received only on a dock/cargo receipt. Such delivery orders and dock/cargo receipts shall certify the place of delivery and origin of the container, the name or names of the person to whom the cargo is being delivered and from which it is shipped, the identity of the owner of the cargo, weight of the cargo, identity of the cargo and the origin and final destination of the container. Copies of such delivery orders and dock/cargo receipts shall be available to the local port Container Committee and the policing agency provided for in (e) below.
 
 
 156
 (d) The Container Committee in each CONASA Port shall promulgate to all carriers and direct employers, and to the Container Committees in each CONASA Port, any and all interpretations of the Rules on Containers as and when they are made. This will include uniform interpretations as and when they are issued. The CONASA-ILA Container Committee shall also promulgate uniform interpretations to local port Container Committees, as and when they are issued.
 
 
 157
 (e) Policing Agency Each CONASA Port shall establish a method of policing and enforcing these Rules on a uniform and non-discriminatory basis. No such method shall be implemented until presented to and approved by the joint CONASA-ILA Container Committee.Rule 10 Container Royalty Payments
 
 
 158
 The two Container Royalty payments required by the CONASA-ILA collective bargaining agreements shall be payable only once in the Continental United States. They shall be paid in that ILA Port where the container is first handled by ILA longshore labor at longshore rates. The second container royalty payment (provided by paragraph 6 of the 1971-1974 CONASA-ILA Memorandum of Agreement) shall be continued and shall be used for fringe benefit purposes only, other than supplemental cash benefits, which purposes are to be determined locally on a port by port basis. Containers originating at a foreign port which are transshipped at a United States port for ultimate destination to another foreign port ("foreign sea-to-foreign-sea containers") are exempt from the payment of container royalties.
 
 ROBB, Circuit Judge, dissenting:
 
 159
 The keystone of the majority opinion is the assertion that the Board erred by failing to consider "all the surrounding circumstances", and in particular by ignoring the "traditional work patterns" of longshoremen. Proper consideration of the "relevant work patterns", says the majority, "would have led to a different categorization for the work in controversy." I do not agree. In my judgment the Board gave proper consideration to the surrounding circumstances, including the traditional work patterns of longshoremen; and I think the Board reached the right result.
 
 
 160
 In the Baltimore Hampton Roads case, 231 N.L.R.B. 351 (1972) the Board affirmed the finding of the Administrative Law Judge that
 
 
 161
 (T)he history of the longshoremen's work tradition in Baltimore and Hampton Roads shows that their role in handling break-bulk import cargo ended at the head of the pier, where an ILA freight handler picked up the cargo and loaded it onto a truck. Thereafter, the fate of that cargo was the responsibility of the motor carrier, as set forth in the bill of lading.
 
 
 162
 The advent of containerization in the ports of Baltimore and Hampton Roads did not change the traditional role of the ILA longshoremen. The motor carriers have treated import shippers' loads destined for consignees located more than 50 miles from the center of the port of entry much as they did break-bulk cargo. For, with very rare exceptions, motor carriers have freely picked up the steamship company's containers mounted on wheeled trailers and hauled them to the consignee in accordance with the bills of lading. The motor carriers have also traditionally hauled such containers to their own truck terminals and have stripped the shippers' loads from them and are loaded into their own trailers, using truck terminal employees, whenever considerations of state regulation, safety, or economy persuaded a motor carrier to take that precaution.
 
 
 163
 Id. at 365.
 
 
 164
 In the New York case the Board held that "traditionally the off-pier stuffing and stripping of containers was performed by consolidating companies and not longshoremen. Since the work was not traditional longshore work and had never been performed by longshoremen, the Rules which require the shipping companies to stop doing business with consolidators did not have a lawful work-preservation object." (J.A. 66a) The Board referred to International Longshoremen's Ass'n, (Conex) 221 N.L.R.B. 956 (1975), Enf'd 537 F.2d 706 (2d Cir. 1976), Cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753, Rehear. denied, 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977). In the Conex case, which the Board in our case held was controlling, the Board found:
 
 
 165
 The traditional work of the longshoremen represented by ILA has been to load and unload ships. When necessary to perform their loading and unloading work, longshoremen have been required to stuff and strip containers on the piers.
 
 
 166
 Similarly, for many years, maritime cargo has been sorted and consolidated off the docks by companies employing teamsters and unrepresented employees. With the advent of vessels designed exclusively to carry the large containers presently in use, these consolidating companies, such as Consolidated and Twin, have continued to consolidate shipments into containers prior to their placement aboard the vessels. The consolidators generate such work themselves, performing it not on behalf of the employer-members of NYSA but for their own customers who have goods to ship. Furthermore, they perform this consolidation work at their own off-pier premises, with their own employees who are outside the unit represented by ILA, and who fall within the coverage of separate collective-bargaining agreements, under which they are represented by other labor organizations. It is clear, therefore, that Consolidated and Twin have traditionally been engaged in the work of stuffing and stripping containers such as are here in controversy.
 
 
 167
 From the foregoing and the record as a whole, it is clear that the on-pier stripping and stuffing work performed by longshoremen as an incident of loading and unloading ships does not embrace the work traditionally performed by Consolidated and Twin at their own off-pier premises. It does not fall within ILA's traditional role to engage in make-work measures by insisting upon stripping and stuffing cargo merely because that cargo was originally containerized by nonunit personnel. Yet, ILA's demands here could only be met if the work traditionally performed off the pier by employees outside the longshoremen unit were taken over and performed at the pier by longshoremen represented by ILA.
 
 Id. at 959-60. (Footnote omitted)
 
 168
 There is substantial evidence in the records of both the Baltimore Hampton Roads case and the New York case to support the Board's finding that the traditional work of longshoremen does not include the work traditionally performed by motor carriers in stripping and stuffing containers. As the Board said the traditional work of longshoremen has been to load and unload ships, and there is substantial evidence that traditionally longshoremen have not stuffed and stripped containers on the pier or elsewhere. Any stuffing or stripping by longshoremen has been only incidental.
 
 
 169
 I am not impressed by the fiction that a container is part of the hold of a ship; if it is, then so is any large box in the hold of a ship. Nor am I persuaded by the "similarities" which the majority perceive between the work of loading and unloading ships and the work of filling and emptying containers. The question is not whether there may be similarities in the work entailed in the two operations. Rather, the question is, who traditionally has done that work.
 
 
 170
 In my opinion the longshoremen are attempting to acquire work they have never had, therefore the defense of work preservation must be rejected. My conclusion is fortified by the decisions of three circuit courts of appeals. International Longshoremen's Ass'n v. NLRB, 537 F.2d 706 (2d Cir. 1976), Cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753, Rehear. denied, 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977); International Longshoremen's Ass'n Local 1575 v. NLRB, 560 F.2d 439 (1st Cir. 1977); Humphrey v. International Longshoremen's Ass'n, 548 F.2d 494, 499-500 (4th Cir. 1977); See International Longshoremen's & Warehousemen's Union Local 13, 208 N.L.R.B. 994 (1974), which this court enforced Per curiam without an opinion, 169 U.S.App.D.C. 300, 515 F.2d 1017 (1975), Cert. denied sub nom., Pacific Maritime Ass'n v. N.L.R.B. 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 347 (1976).
 
 
 171
 I would deny the petitions for review and enforce the Board's orders.
 
 
 
 [1]
 No. 78-1510, reviewing International Longshoremen's Ass'n, 98 L.R.R.M. 1276 (1978)
 
 
 [2]
 Nos. 77-1735 and 77-1758, reviewing International Longshoremen's Ass'n, 231 N.L.R.B. 351 (1977)
 
 
 [3]
 The two cases, though strikingly similar and capable of being treated in a single opinion, have presented the court with independent sets of documents: briefs, joint appendices, etc. Because reference to these documents may cause some confusion, this opinion where necessary will identify the document within the appropriate case by provision of a parenthetical abbreviation of the relevant port or ports. For example, the Joint Appendix (JA) for Nos. 77-1735 and 77-1758, arising in Baltimore and Hampton Roads, will be cited as JA(B-HR); that for No. 78-1510, arising in New York, will be cited as JA(NY)
 
 
 [4]
 29 U.S.C. § 160(e), (f) (1976)
 
 
 [5]
 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)
 
 
 [6]
 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977)
 
 
 [7]
 See Ross, Waterfront Labor Response to Technological Change: A Tale of Two Unions, 21 Lab.L.J. 397, 398-400 (1970). The impact of containerization has been felt in ports around the world. See, e. g., Davies, In Search of Jobs and Defendants, 36 Mod.L.Rev. 78 (1973) (detailing controversies caused by containerization in British ports of Liverpool, Hull, and London)
 
 
 [8]
 See, e. g., JA(B-HR) 1056a (specifying allowable weight of one container as 33,000 pounds)
 
 
 [9]
 See JA(B-HR) 337a-339a, 1087a-1089a (describing traditional work patterns of ILA labor on the docks); Ross, Supra note 7, at 398-399 (same)
 
 
 [10]
 JA(B-HR) 1090a-1091a (before containerization, "an employer * * * thought he was doing good with 30 ton per gang of 22 men. We can now with the container handling method, with a crane, one crane, and a 20-man gang load as high as 600 tons per hour * * *."); See Ross, Supra note 7, at 400 (one major shipper reports twentyfold increase in productivity)
 
 
 [11]
 Other nations have made different choices. See, e. g., Redundancy Payments Act 1965, Recodified in Employment Protection Consolidation Act 1978 (British legislation that compensates workers who have been made "redundant" due to managerial initiative or technological innovation). For a critique of this Act, See Fryer, The Myths of the Redundancy Payments Act, 2 Indus.L.J. 1 (1973)
 
 
 [12]
 231 N.L.R.B. at 358
 
 
 [13]
 Id. at 360
 
 
 [14]
 JA(B-HR) 1092a-1093a
 
 
 [15]
 JA(NY) 95a (rejected affidavit of John M. Haynes, Executive Vice President of NYSA). The strike lasted over 100 days in other ports on the Atlantic and Gulf coasts. Id
 Because the Administrative Law Judge (ALJ) in No. 78-1510 (NY) believed that the case before him was controlled by International Longshoremen's Ass'n v. NLRB, 537 F.2d 706 (2d Cir. 1976), Cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977), he refused to permit the petitioners here to adduce and develop virtually any facts in their defense. See ALJ's Order Striking All Affirmative Defenses, JA(NY) 47a-51a; ALJ's Order Rejecting Evidence and Closing Hearing, JA(NY) 52a-53a. Accordingly, proffered affidavits that were rejected by the ALJ, such as the one cited in this footnote, will be noted as such.
 
 
 [16]
 See Intercontinental Container Transport Corp. v. New York Shipping Ass'n, 426 F.2d 884, 888 (2d Cir. 1970) ("In the course of the controversy preceding the execution of the (1968-71 collective bargaining agreement), a Taft-Hartley 80-day injunction was granted and the Board of Inquiry set up in connection with that injunction stated in its report to the President that containerization was the 'most urgent item' of difference between the parties.")
 
 
 [17]
 The Rules on Containers as included in the 1968 Hampton Roads agreement are reproduced at JA(B-HR) 529a-531a. The Rules as included in the 1968 Baltimore agreement are reproduced at JA(B-HR) 553a-555a. The Rules as included in the 1968 New York master contract are discussed in respondent's brief (NY) at 6. Any differences among the three versions are, for present purposes, insignificant. The 1968 Rules for Hampton Roads are reprinted in Appendix A to this opinion
 
 
 [18]
 See 231 N.L.R.B. at 359; JA(B-HR) 78a, 462a-463a, 1023a, 1091a
 
 
 [19]
 JA(B-HR) 1112a
 
 
 [20]
 231 N.L.R.B. at 354 n.8 (Fanning, Chairman, dissenting)
 
 
 [21]
 Id. at 362
 
 
 [22]
 231 N.L.R.B. at 359; JA(B-HR) 68a-69a. This opinion uses the terms "FSL" and "shippers' load" interchangeably, and will often refer to LTL, LCL, and CFCL cargo by the generic term "consolidated container loads." Also, the term "shipper" is used to refer to a shipping company that is a member of a CONASA shipping association
 
 
 [23]
 231 N.L.R.B. at 359
 
 
 [24]
 Id. at 359-360
 
 
 [25]
 See Title I (introductory title to 1968 Rules on Containers entitled "Containerization"), Reprinted in Appendix A Infra
 
 
 [26]
 See Rule C.5 (liquidated damages clause in 1968 Hampton Roads Rules on Containers providing for damages of $150 per container), Reprinted in Appendix A Infra. Liquidated damages were $250 per container both in Baltimore, JA(B-HR) 555a, and in New York, respondent's brief (NY) at 6
 
 
 [27]
 See 231 N.L.R.B. at 360; JA(B-HR) 94a-95a, 146a-147a, 302a, 555a
 
 
 [28]
 JA(NY) 101a (rejected affidavit of John M. Haynes)
 
 
 [29]
 Liquidated damages were increased to $1,000 per container in both ports. The Rules on Containers as included in the 1971-1974 Hampton Roads and Baltimore agreements are reproduced at JA(B-HR) 534a-536a and JA(B-HR) 556a-559a, respectively
 
 
 [30]
 231 N.L.R.B. at 360
 
 
 [31]
 Id. at 362 ("The motor carrier's decision to strip the full shipper's load may rest upon consideration of economy, safety, or state highway and bridge regulations.")
 
 
 [32]
 See Rule C.7, Reprinted in Appendix A Infra
 
 
 [33]
 231 N.L.R.B. at 362; JA(B-HR) 150a, 318a, 354a, 475a, 998a, 1032a, 1035a-1036a, 1108a-1109a, 1140a-1143a. The Committees apparently believed that FSL containers were not expressly covered by the Rules because these containers are consigned directly to their beneficial owners and thus, unlike CFCL, LTL, and LCL containers, inherently involve no stripping prior to delivery of the cargo to its beneficial owner. Where this is not the case because shortstopping occurs, it would follow that FSL containers come within the scope of the Rules. See 231 N.L.R.B. at 355 (Fanning, Chairman, dissenting) ("The traditional exemption for shippers' loads was premised on the understanding that such loads are 'through' containers, much larger in size but properly analogous to a single item of bulk cargo. When taken to a trucker's warehouse to be stripped and repacked, they lose that identity.")
 
 
 [34]
 231 N.L.R.B. at 362
 
 
 [35]
 The Dublin Supplement is reproduced at JA(B-HR) 549a
 
 
 [36]
 231 N.L.R.B. at 360; JA(B-HR) 260a-261a, 549a-551a, 1027a-1028a, 1034a. In dissent Chairman Fanning contended that the Dublin Supplement carved out an exception to the stuffing and stripping rights of the ILA with respect to All FSL containers stuffed and stripped within 50 miles of port by other than the employees of the cargo's beneficial owner. 231 N.L.R.B. at 355 n.11 (Fanning, Chairman, dissenting). Chairman Fanning's colleagues in the majority, however, flatly disagreed with his characterization. Id. at 352. The proper characterization of the Dublin Supplement, whatever it may be, is not germane to our decision
 
 
 [37]
 The Rules on Containers as adopted in the 1974 Baltimore and Hampton Roads agreements are reproduced at JA(B-HR) 561a-563a and JA(B-HR) 537a-543a, respectively. Because they differ in some significant respects from the 1968 and 1971 Rules, the 1974 Rules are reproduced in Appendix B to this opinion
 
 
 [38]
 231 N.L.R.B. at 361. See Rule 1(a), Reprinted in Appendix B Infra
 
 
 [39]
 See Rule 2, Reprinted in Appendix B Infra
 
 
 [40]
 JA(NY) 83a-89a (rejected affidavit of John M. Haynes)
 
 
 [41]
 Id
 
 
 [42]
 A pallet is a portable platform designed for handling by forklift truck or crane and used for movement of goods
 
 
 [43]
 JA(NY) 83a-85a (rejected affidavit of John M. Haynes)
 
 
 [44]
 JA(NY) 88a-90a (rejected affidavit of John M. Haynes)
 
 
 [45]
 JA(NY) 95a (rejected affidavit of John M. Haynes). See International Longshoremen's Ass'n, 221 N.L.R.B. 956, 957 (1975)
 
 
 [46]
 JA(NY) 90a-91a (rejected affidavit of John M. Haynes)
 
 
 [47]
 JA(NY) 91a (rejected affidavit of John M. Haynes)
 
 
 [48]
 Id
 
 
 [49]
 JA(NY) 92a (rejected affidavit of John M. Haynes). According to the ALJ in International Longshoremen's Ass'n, 221 N.L.R.B. 956 (1975), "(t)here is substantial conflict" over whether this clause and its predecessor aimed to secure LTL, LCL, and CFCL stripping and stuffing for ILA labor. Id. at 968. The Board itself in that case apparently believed that the provisions did not go that far. Id. at 960
 
 
 [50]
 JA(NY) 95a (rejected affidavit of John M. Haynes)
 
 
 [51]
 29 U.S.C. § 171 Et seq. (1976)
 
 
 [52]
 (T)he employers won the right to continue to move most containers, namely non-consolidated full shipper loads, without stuffing or stripping by union members. Thus, manufacturers' loads or full shippers' loads, as well as all containers coming from or going to points fifty or more miles from a port, constituting 80% Of the containers moving in the Port of Greater New York, were excluded from the stuffing and stripping requirements. * * *
 JA(NY) 97a (rejected affidavit of John M. Haynes).
 
 
 [53]
 See Title I (introductory title to 1968 Rules on Containers entitled "Containerization"), Reprinted in Appendix A Infra
 
 
 [54]
 JA(NY) 101a (rejected affidavit of John M. Haynes)
 
 
 [55]
 See text at notes 35-36 Supra ; JA(NY) 19a (NLRB Order Consolidating Cases, etc.)
 
 
 [56]
 The relevant provisions of the 1974 Rules in New York are reproduced at JA(NY) 16a-23a and are substantially identical to the Rules adopted in Baltimore and Hampton Roads. See Appendix B Infra
 Subsequent to adoption of the 1974 collective bargaining agreement, but before its termination, conflict arose between the ILA and the shippers over whether the shippers had been abiding by the Rules. The ILA announced its intention to reopen the Rules, See Rule 8, Reprinted at Appendix B Infra, and later unilaterally suspended the Rules and began to strip all containers with the exception of shippers' loads bound for destinations outside the port area. Later, the parties resolved their differences and reinstituted the Rules in clarified form. See JA(NY) 108a (rejected affidavit of John M. Haynes).
 
 
 [57]
 Houff and Associated are interstate common carriers licensed by the Interstate Commerce Commission (ICC); Dolphin and San Juan possess no such license
 
 
 [58]
 231 N.L.R.B. at 358, 361 Et seq
 
 
 [59]
 Id. at 358
 
 
 [60]
 Id. at 359
 
 
 [61]
 Id. at 361; JA(B-HR) 191a-192a
 
 
 [62]
 231 N.L.R.B. at 360
 
 
 [63]
 Id
 
 
 [64]
 Id. at 362 ("The motor carrier's decision to strip the full shipper's load may rest upon consideration of economy, safety, or state highway and bridge regulations."). See JA(B-HR) 154a-155a, 180a-182a, 231a, 267a-268a. See also text at note 31 Supra
 
 
 [65]
 231 N.L.R.B. at 352 ("These (trucking industry) officials testified only that (CONASA and the ILA) and certain shipping personnel deemed these actions to be violations, not that they actually were violations, or that the trucking industry acknowledged them to be such."); See id. at 356 n.22 (Fanning, Chairman, dissenting)
 
 
 [66]
 98 L.R.R.M. at 1277
 
 
 [67]
 Id
 
 
 [68]
 See text at notes 46-49 Supra
 
 
 [69]
 Petitioners' brief (NY) at 17-18; See JA(NY) 120a-121a (rejected affidavit of William O. Gohlke, former officer of Sea-Land Services, Inc. and Seatrain Lines, Inc.):
 It was quite apparent to me that though the bills of lading and other documentation suggested that the Dolphin cargo was booked as having an originating point in Massachusetts, this was not the case. The recordings of the turnaround of containers and related equipment issued on Dolphin bookings clearly showed that insufficient time elapsed between the issuance and return of the equipment to permit the containers to be transported to Massachusetts and back. This left the unmistakable impression that the loading of the containers had to have taken place in the New York-New Jersey proximity of the Seatrain operation. It was not Seatrain's concern or my concern as an official of Seatrain to inquire into this practice. Seatrain's and my objective was to obtain business and transporting containers to and from Puerto Rico. * * *
 
 
 [70]
 JA(NY) 164a
 
 
 [71]
 JA(NY) 156a-174a
 
 
 [72]
 231 N.L.R.B. at 363; JA(B-HR) 195a-196a. Apparently the documentation presented to United States Lines by Associated did not indicate that the containers would be stripped at Associated's terminal by Associated's employees. There is no mention in the correspondence subsequent to the incident that the documentation presented to United States Lines served to notify the shipper of Associated's intention to strip the container, JA(B-HR) 655a-661a, and the ALJ merely noted that the consignees, whose names and locations would have been found on the delivery orders and bills of lading, were located in Tennessee and North Carolina, 231 N.L.R.B. at 363. See id. at 356 n.18 (Fanning, Chairman, dissenting) ("(W)hen a container is released to a motor carrier, the delivery order specifies that the cargo is to be transported to the consignee. Intent to shortstop is thereby difficult to ascertain * * * .")
 
 
 [73]
 231 N.L.R.B. at 363
 
 
 [74]
 Id. The ruling was based on Rules 1(a)(3) and 2B. (2), Reprinted in Appendix B Infra
 
 
 [75]
 231 N.L.R.B. at 363
 
 
 [76]
 Id
 
 
 [77]
 Id. at 362. Apparently the documentation presented to United States Lines and to Lavino did not indicate that the containers would be stripped at Houff's terminal by Houff's employees. Id. ("The delivery order and bill of lading issued to Houff for the U.S. Lines containers showed the cargo was destined to Union Carbide Corporation, Alloy, West Virginia."); JA(B-HR) 1052a. Compare 231 N.L.R.B. at 356 n.18 (Fanning, Chairman, dissenting)
 
 
 [78]
 231 N.L.R.B. at 362. The ruling was based on Rules 1(a)(3) and 2B. (2), Reprinted in Appendix B Infra
 
 
 [79]
 231 N.L.R.B. at 362-363
 
 
 [80]
 98 L.R.R.M. at 1277
 
 
 [81]
 Id.; JA(NY) 25a (NLRB Order Consolidating Cases, etc.). The ruling was based on Rule 1(a)(1), Reprinted in Appendix B Infra
 
 
 [82]
 98 L.R.R.M. at 1277
 
 
 [83]
 The precise Rules challenged were those that were held applicable to the respective charging parties' activities. See notes 74, 78, & 81 Supra
 
 
 [84]
 See generally Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e), 113 U.Pa.L.Rev. 1000, 1004-1018 (1965) (describing "relevance and content" of the primary-secondary dichotomy)
 
 
 [85]
 Local 761, IUERMW v. NLRB, 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961) (opinion of Frankfurter, J.)
 
 
 [86]
 Id. at 674, 81 S.Ct. 1285
 
 
 [87]
 29 U.S.C. § 158(b)(4)(B), (e) (1976)
 
 
 [88]
 Aaron, The Labor-Management Reporting and Disclosure Act of 1959 (pt. 2), 73 Harv.L.Rev. 1086, 1113 (1960)
 
 
 [89]
 See Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363, 1364 (1962)
 
 
 [90]
 (b) Unfair labor practices by labor organization
 It shall be an unfair labor practice for a labor organization or its agents
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing(.)
 29 U.S.C. § 158(b)(4)(B) (1976).
 
 
 [91]
 See, e. g., S.Rep. No. 105, 80th Cong., 1st Sess. 22 (1947), Reprinted in I NLRB, Legislative History of the Labor Management Relations Act, 1947 at 428 (1948) (hereinafter cited as Legislative History)
 
 
 [92]
 29 U.S.C. § 158(b)(4)(B) (1976)
 
 
 [93]
 29 U.S.C. § 158(e) (1976)
 
 
 [94]
 NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters, 429 U.S. 507, 517, 97 S.Ct. 891, 898, 51 L.Ed.2d 1 (1977)
 
 
 [95]
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception
 29 U.S.C. § 158(e) (1976).
 
 
 [96]
 See NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters, 429 U.S. 507, 517, 97 S.Ct. 891, 898, 51 L.Ed.2d 1 (1977) (provision interpreted "as having no broader reach than § 8(b)(4) itself"); National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 620, 623-629, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)
 
 
 [97]
 H. Wellington, Labor and the Legal Process 275 (1968)
 
 
 [98]
 S.Rep. No. 105, 80th Cong., 1st Sess. 22 (1947), Reprinted in Legislative History, Supra note 91, at 428
 
 
 [99]
 Professor Cox, for example, after reviewing the possibilities presented under the current legislation, concluded that the problems in applying the secondary boycott provisions "can be minimized by more careful statutory classification." A. Cox, Law and the National Labor Policy 38 (1960)
 
 
 [100]
 See Goetz, Secondary Boycotts and the LMRA: A Path Through the Swamp, 19 Kans.L.Rev. 651, 658-703 (1971) (describing the various contexts in which secondary boycotts occur)
 
 
 [101]
 See, e.g., NLRB v. Business Mach. & Office Appliance Mechanics Conf. Board, 228 F.2d 553, 559 (2d Cir. 1955) ("We therefore hold that an employer is not within the protection of § 8(b)(4)((B)) when he knowingly does work which would otherwise be done by the striking employees of the primary employer and where this work is paid for by the primary employer pursuant to an arrangement devised and originated by him to enable him to meet his contractual obligations.")
 
 
 [102]
 See, e.g., Local 761, IUERMW v. NLRB, supra note 85, 366 U.S. at 680-682, 81 S.Ct. 1285 (the portion of the struck employer's premises used by employees of independent contractors who perform tasks connected to the normal operations of the struck employer are not exempted from strike activity by the struck employer's employees under § 8(b)(4)((B)))
 
 
 [103]
 See, e.g., NLRB v. Fruit & Vegetable Packers & Warehousemen, 377 U.S. 58, 71-72, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (picketing confined to persuading customers to cease buying the product of the primary employer is not proscribed by § 8(b)(4)(ii)(B))
 
 
 [104]
 See, e.g., NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters, 429 U.S. 507, 517, 97 S.Ct. 891, 898, 51 L.Ed.2d 1 (1977) ("Section 8(e) does not prohibit agreements made for 'primary' purposes, including the purpose of preserving for the contracting employees themselves work traditionally done by them."). Alleged hot cargo clauses may have application in areas other than work preservation, but these are of no concern here. See Goetz, Supra note 100, 19 Kans.L.Rev. at 683-694
 
 
 [105]
 One commentator has lamented that "(t)he pressures created by momentous problems of productivity and job security under changing technological and market conditions are contained or released by no more sensitive a legal instrument than a legislative determination to protect neutrals from being drawn into the disputes of others." Lesnick, supra note 84, 113 U.Pa.L.Rev. at 1041
 
 
 [106]
 An interesting contrast is Great Britain, which not only has a system of compensation designed to alleviate the strain on workers who are made "redundant," See note 11 Supra, but which also has attempted to solve its version of the containerization controversy through direct parliamentary intervention. See Dock Work Regulations Act 1976
 
 
 [107]
 The leading Supreme Court cases are discussed in text at notes 109-132 Infra. For cases from the Courts of Appeals, See, e.g., American Boiler Manufacturers Ass'n v.NLRB, 404 F.2d 547, 561 (8th Cir. 1968), Cert. denied, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970) (no violation of the NLRA's prohibition of secondary boycotts when the union's conduct was addressed to enforcement of its collective bargaining agreement, when the conduct related solely to preservation of the traditional tasks of jobsite plumbers, and when the union had no objectives elsewhere); Meat & Highway Drivers, Dockmen, etc., Local 710 v. NLRB, 118 U.S.App.D.C. 287, 291, 335 F.2d 709, 713 (1964) ("If the jobs are fairly claimable by the unit, they may, without violating either § 8(e) or § 8(b)(4)(A) or (B), be protected by provision for, and implementation of, no-subcontracting or union standards clauses in the bargaining agreements." (footnotes omitted))
 
 
 [108]
 See note 184 Infra (citing cases); H. Wellington, Supra note 97, at 275 ("the (NLRA) does not interdict the primary strike Or its attendant consequences." (emphasis added; footnote omitted))
 
 
 [109]
 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)
 
 
 [110]
 29 U.S.C. § 158(e) (1976)
 
 
 [111]
 386 U.S. at 615-616, 87 S.Ct. 1250
 
 
 [112]
 Id. at 645-646, 87 S.Ct. 1250
 
 
 [113]
 Id. at 644, 87 S.Ct. at 1268 (footnote omitted). The Court provided an elaboration of "all the surrounding circumstances" in a footnote:
 As a general proposition, such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry. * * *
 Id. at 644 n.38, 87 S.Ct. at 1268 n.38.
 
 
 [114]
 Id. at 645, 87 S.Ct. at 1268 (footnote omitted)
 
 
 [115]
 R. Gorman, Labor Law 265 (1976). On the day National Woodwork was decided the Court also handed down a companion case. In Houston Insulation Contractors' Ass'n v. NLRB, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967), the Court, relying largely on the reasoning in National Woodwork, held that a work preservation agreement between a company and a local union could be effectuated by another local of the same union. See R. Gorman, Supra
 
 
 [116]
 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977)
 
 
 [117]
 Id. at 512, 97 S.Ct. 891
 
 
 [118]
 Id. at 511-513, 97 S.Ct. 891
 
 
 [119]
 204 N.L.R.B. 760, 760 (1973)
 
 
 [120]
 Id
 
 
 [121]
 429 U.S. at 521, 97 S.Ct. 891. See R. Dereshinsky, The NLRB and Secondary Boycotts 117 (1972) ("Essentially, the test required that the employer have the right to control the matter at issue in order to be designated a primary employer.")
 
 
 [122]
 204 N.L.R.B. at 760
 
 
 [123]
 Enterprise Ass'n of Steam, etc. Pipefitters v. NLRB, 172 U.S.App.D.C. 225, 521 F.2d 885 (1975) (En banc ), Rev'd, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977)
 
 
 [124]
 429 U.S. at 532, 97 S.Ct. 891
 
 
 [125]
 Id. at 511, 97 S.Ct. at 894 (Quoting National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. at 645, 87 S.Ct. 1250)
 
 
 [126]
 Id. at 517, 97 S.Ct. at 898 (Citing National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. at 635, 87 S.Ct. 1250)
 
 
 [127]
 386 U.S. at 644, 87 S.Ct. 1250
 
 
 [128]
 429 U.S. at 524, 97 S.Ct. 891
 
 
 [129]
 386 U.S. at 645, 87 S.Ct. 1250, 1268-1269, Quoted at 429 U.S. at 511, 528, 97 S.Ct. 891
 
 
 [130]
 429 U.S. at 514-521, 97 S.Ct. 891
 
 
 [131]
 Id. at 521-528, 97 S.Ct. 891
 
 
 [132]
 Id. at 531, 97 S.Ct. at 905 (Quoting 29 U.S.C. § 160(e) (1976))
 
 
 [133]
 426 F.2d 884 (2d Cir. 1970)
 
 
 [134]
 15 U.S.C. § 1 Et seq. (1976)
 
 
 [135]
 See Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). For a recent statement of the Supreme Court's views on the labor exemption to the antitrust laws, See Connell Constr. Co. v. Plumbers & Steamfitters, Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)
 
 
 [136]
 426 F.2d at 887
 
 
 [137]
 Id. (Citing National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); Order of Railroad Telegraphers v. Chicago & Northwestern R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960))
 
 
 [138]
 Id
 
 
 [139]
 Id. at 888
 
 
 [140]
 29 U.S.C. § 158(e) (1976)
 
 
 [141]
 29 U.S.C. § 158(b)(4)(ii)(B) (1976)
 
 
 [142]
 International Longshoremen's Ass'n, 221 N.L.R.B. 956 (1975)
 
 
 [143]
 537 F.2d 706 (2d Cir. 1976), Cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). Circuit Judge Feinberg dissented from the majority decision issued by Senior Circuit Judge Moore and Senior District Judge Wyzanski, sitting by designation
 
 
 [144]
 Id. at 708 n.1
 
 
 [145]
 Correspondingly, the District Court for the District of New Jersey, in a suit brought subsequent to the Second Circuit's decision in Conex, held that, just as an antitrust determination does not control a labor case, a labor law determination of unlawful work acquisition does not obviate the need for inquiry under the antitrust laws. The court denied summary judgment in favor of antitrust claims that grew out of Conex. See Consolidated Express, Inc. v. New York Shipping Ass'n, 452 F.Supp. 1024, 1036-1044 (D.N.J.1977), Rev'd on other grounds, 602 F.2d 494 (3d Cir. 1979)
 
 
 [146]
 221 N.L.R.B. at 959
 
 
 [147]
 Id. at 959-961
 
 
 [148]
 537 F.2d at 712
 
 
 [149]
 560 F.2d 439 (1st Cir. 1977)
 
 
 [150]
 Id. at 442-443
 
 
 [151]
 Id. at 445
 
 
 [152]
 Id
 
 
 [153]
 Id. at 445-446
 
 
 [154]
 The First Circuit also discussed the Supreme Court's decision in Pipefitters, which was handed down just six days after oral argument in the First Circuit case. The First Circuit reasonably interpreted Pipefitters as supportive of the Board's discretion in assigning degrees of importance to the various circumstances involved in each case. 429 U.S. at 524, 97 S.Ct. 891. The First Circuit concluded that the Supreme Court's reasoning in Pipefitters "remove(s) any lingering doubts as to the enforceability of the Board's present order." 560 F.2d at 446
 
 
 [155]
 548 F.2d 494 (4th Cir. 1977)
 
 
 [156]
 401 F.Supp. 1401 (E.D.Va.1975), Vacated, 548 F.2d 494 (4th Cir. 1977). Compare the District Court's conflicting decision in Humphrey v. International Longshoremen's Ass'n, D.Md. No. Y-75-1395, decided March 25, 1976 (unreported)
 
 
 [157]
 401 F.Supp. at 1407
 
 
 [158]
 Circuit Judge Craven dissented from the majority opinion authored by Circuit Judge Russell and joined by Chief Judge Markey of the United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [159]
 548 F.2d at 500 (footnote omitted)
 
 
 [160]
 See Rules 1(a)(2), (3), and 2B. (2), Reprinted in Appendix B Infra. The Dublin Supplement, Discussed in text at notes 35-36 Supra, exempted from these provisions FSL containers whose cargo was to be stripped within the 50-mile radius and stored in a warehouse for at least 30 days. See Rule 2B. (4), Reprinted in Appendix B Infra
 
 
 [161]
 See Rule 1(a)(1), (2), Reprinted in Appendix B Infra
 
 
 [162]
 See text at notes 127-132 Supra (enumerating points of law from National Woodwork and Pipefitters )
 
 
 [163]
 National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 644, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); See NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters, 429 U.S. 507, 524, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977)
 
 
 [164]
 See International Longshoremen's Ass'n, 221 N.L.R.B. 956, 959 (1975) ("in order to properly evaluate the validity of ILA's claim to the work, 'it is essential to define with some precision the work in controversy since that is the predicate upon which the issue of work preservation must turn.' " (Quoting ALJ))
 
 
 [165]
 See 231 N.L.R.B. at 352, 365 (off-pier stripping of FSL containers within 50 miles of port); 98 L.R.R.M. at 1277 ("traditionally the off-pier stuffing and stripping of containers was performed by consolidating companies and not longshoremen")
 
 
 [166]
 231 N.L.R.B. at 365; 98 L.R.R.M. at 1277
 
 
 [167]
 231 N.L.R.B. at 365; 98 L.R.R.M. at 1277
 
 
 [168]
 231 N.L.R.B. at 365; 98 L.R.R.M. at 1277
 
 
 [169]
 429 U.S. at 524, 97 S.Ct. 891; 386 U.S. at 644, 87 S.Ct. 1250
 
 
 [170]
 The Board's definition of the work in controversy in the instant cases stands in vivid contrast to its definition in Pipefitters. In the latter case the NLRB held that the provision at issue was a valid work preservation clause, 204 N.L.R.B. at 760, because the clause "was for the purpose of preserving work (that the pipefitters) had traditionally performed." Id. That traditional work was the cutting and threading of pipes, a category that, unlike the one chosen in the present cases, takes into account work patterns both prior and subsequent to the innovation. This definition of the work in controversy in Pipefitters was not upset by the Supreme Court. 429 U.S. at 521 n.8, 97 S.Ct. 891. Rather, the Court focused primarily on the Board's application of the right to control test. As put by the Court, "The question now before us is whether a union seeking the kind of work traditionally performed by its members at a construction site violates § 8(b)(4)(B) when it induces its members to engaged in a work stoppage against an employer who does not have control over the assignment of the work sought by the union." Id. at 510-511, 97 S.Ct. at 894. The right to control test is discussed in the context of the instant cases in text at notes 187-192 Infra
 
 
 [171]
 Note the expansive language used by the NLRB when it originally certified the longshore unit in the Port of New York:
 All longshore employees engaged In work pertaining to the rigging of ships, coaling of same, Loading and unloading of cargoes, including mail, ships' stores and baggage, handling lines in connection with the docking and undocking of ships, including hatch bosses; cargo repairmen, checkers, clerks and time keepers and their assistants, including head receiving and delivery clerks; general maintenance, mechanical and miscellaneous workers; horse and cattle fitters, grain ceilers, and marine carpenters, in the Port of Greater New York and vicinity * * *.
 New York Shipping Ass'n, Inc., 116 N.L.R.B. 1183, 1188 (1956) (emphasis added; footnote omitted).
 
 
 [172]
 See text at notes and notes 9, 18, & 43 Supra
 
 
 [173]
 Although the location of the work has changed as well, in the sense that the stripping and stuffing at controversy here is done off pier, this is not an immutable characteristic of the work; it just as easily could be done on pier. That the NLRB found good reason for containers to be stripped before being trucked to meet state highway and bridge laws, to better balance the cargo, to use trailer space efficiently (respondent's brief (B-HR) at 8) is therefore immaterial. The essential stripping need not occur away from the dock. Moreover, the challenged Rules affect only those containers that are to be stripped or stuffed within 50 miles of port; the shift of this work back to the dock is not, therefore, implausible
 It should be noted that use of the new equipment containers does not require that ILA labor undergo retraining. But even if it did, this would not perforce mean that efforts to claim work involving the new equipment would be secondary. See Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401, 1411 (1968) ("(I)f technological change requires employee retraining, nothing in the primary-secondary rationale justifies forbidding the union to claim and preserve jobs." (footnote omitted)).
 
 
 [174]
 Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 53 (2d Cir. 1976), Aff'd sub nom. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). This case held that the Longshoremen's and Harbor Workers' Compensation Act covers employees stuffing and stripping containers away from the ships that carried them
 
 
 [175]
 Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 270, 97 S.Ct. 2348, 2361, 53 L.Ed.2d 320 (1977), Aff'g Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35 (2d Cir. 1976)
 
 
 [176]
 See International Longshoremen's Ass'n, 221 N.L.R.B. 956, 957 (1975) ("As fewer cargo units reached the piers, there was a proportionate decrease in loading and unloading work for the longshoremen represented by (the) ILA."); note 10 Supra (citing two estimates of productivity increases due to containerization); JA(B-HR) 457a (Gleason testimony) (the number of longshore employees and the number of man-hours they have worked have gone down dramatically in recent years). It is useful in this context to point out that the Supreme Court in National Woodwork provided as an example of a "surrounding circumstance" "the threat of displacement by the banned product or services." 386 U.S. at 644 n.38, 87 S.Ct. at 1268 n.38
 
 
 [177]
 It is not difficult to imagine a party unhappy with this court's decision today subjecting that decision to the following exercise in Reductio ad absurdum : Under the court's ruling, cannot longshoremen literally chase containers around the country, demanding the right to stuff and strip them? There is a short answer: No. Our decision does not radiate beyond the Rules on Containers, which are restricted in terms to a 50-mile area around each port
 
 
 [178]
 In Conex the Board argued that the ILA had abandoned any right to the work in controversy due both to its 1959 agreement with the NYSA, See text at notes 46-48 Supra, and to the period of time between the advent of containerization and attempts by the ILA, through the Rules, to secure the work. Even though the Second Circuit affirmed the Board, it disavowed this point's validity. 537 F.2d at 712
 The Board apparently does not rely on this abandonment point in the instant cases, but Chairman Fanning used the point to justify the fact that he dissented in the Baltimore-Hampton Roads case and concurred in the New York case. In our view the abandonment point is without merit. We break no new ground when we characterize collective bargaining as "a constant and unending dialogue of powers." O. Kahn-Freund, Labour and the Law 15 (2d ed. 1977). As in any dialogue, the most appropriate response cannot always be framed instantaneously. Rather, ideas generally develop over time; the best ideas may indeed require the longest gestation periods. Be that as it may, the crucial point here is that the dialogue over how best to assimilate containerization and, more particularly, the work of stuffing and stripping containers in the port area into traditional longshore work patterns has never ceased. As Part I of this opinion demonstrates, the issue of containerization has been a key ingredient in ILA-shipper relations from the moment of its inception to the present.
 Further, the abandonment point ignores the possibility of recapturing work that, due to technological innovation or managerial initiative, has temporarily escaped from the bargaining unit. Compare Note, Work Recapture Agreements and Secondary Boycotts, 90 Harv.L.Rev. 815 (1977) (arguing for an intermediate category of "work recapture" between the categories of "work preservation" and "work acquisition"), With Meat & Highway Drivers, Dockmen, etc., Local 710 v. NLRB, 118 U.S.App.D.C. 287, 292, 335 F.2d 709, 714 (1964) ("Moreover, in the case before us, we have not work acquisition but work recapture.").
 A variation on the abandonment theme is offered by intervenor Houff Transfer, Inc. in the Baltimore and Hampton Roads case. Houff argues that the negotiation of the royalty payment provision in the Rules represents a conscious choice on the part of the ILA to accept that payment instead of the work of stuffing and stripping FSL containers. Intervenor's brief at 26 Et seq. The argument is plausible only to the extent that abandonment took place with respect to FSL containers that go directly to their beneficial owners or to a point outside a 50-mile radius of the ports for stripping. The ILA has consistently proven antagonistic to the idea that any containers can be stripped or stuffed in the port area by other than ILA labor. This hardly amounts to abandonment, the royalty payment notwithstanding. For a case where abandonment may have taken place, See International Longshoremen's & Warehousemen's Union, 208 N.L.R.B. 994 (1974), Aff'd (mem.), 169 U.S.App.D.C. 301, 515 F.2d 1018 (1975), Cert. denied, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 347 (1976).
 
 
 [179]
 386 U.S. at 645, 87 S.Ct. at 1268-1269; See 429 U.S. at 511, 528, 97 S.Ct. 891
 
 
 [180]
 386 U.S. at 644, 87 S.Ct. 1268; See 429 U.S. at 511, 528, 97 S.Ct. 891, 903
 
 
 [181]
 See Part I Supra
 
 
 [182]
 Id
 
 
 [183]
 Thus the First Circuit's observation to this effect in International Longshoremen's Ass'n v. NLRB, 560 F.2d 439, 445 (1st Cir. 1977), is inapposite here
 
 
 [184]
 National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967) ("however severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective"). Courts of Appeals have consistently followed the rule that a valid work preservation clause does not become illegal because it has a serious impact upon third parties. See, e.g., Local 742, United Brhd of Carpenters v. NLRB, 144 U.S.App.D.C. 20, 26, 444 F.2d 895, 901, Cert. denied, 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971); American Boiler Manufacturers Ass'n v. NLRB, 404 F.2d 547, 552 (8th Cir. 1968), Cert. denied, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970); NLRB v. Local 28, Sheet Metal Wkrs International Ass'n, 380 F.2d 827, 830 (2d Cir. 1967)
 
 
 [185]
 386 U.S. at 645, 87 S.Ct. at 1268-1269
 
 
 [186]
 429 U.S. at 514-521, 97 S.Ct. 891
 
 
 [187]
 Four circuits had rejected the right to control test as a departure from National Woodwork's instruction to consider "all the surrounding circumstances." 386 U.S. at 644, 87 S.Ct. 1250. See Local 636, United Ass'n of Journeymen v. NLRB, 139 U.S.App.D.C. 165, 430 F.2d 906 (1970); Beacon Castle Square Building Corp. v. NLRB, 406 F.2d 188 (4th Cir. 1969) (dictum); American Boiler Manufacturers Ass'n v. NLRB, 404 F.2d 556 (8th Cir. 1968), Cert. denied, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970); NLRB v. Local 164, International Brhd of Electrical Wkrs., 388 F.2d 105 (3d Cir. 1968). The Fourth and Ninth Circuits accepted the test's validity. Associated General Contractors, Inc. v. NLRB, 514 F.2d 433 (9th Cir. 1975); George Koch Sons, Inc. v. NLRB, 490 F.2d 323 (4th Cir. 1973)
 
 
 [188]
 429 U.S. at 521, 97 S.Ct. 891
 
 
 [189]
 Id. at 514-521, 97 S.Ct. 891
 
 
 [190]
 The Board notes that the Equipment Interchange Agreement used by United States Lines granted truckers "control" over containers in their "custody and possession." 231 N.L.R.B. at 361, 365. As these cases amply demonstrate, however, and as the NLRB itself recognizes, 231 N.L.R.B. at 362-363; 98 L.R.R.M. at 1277, the shipper's power of disposal over the containers is not thereby impaired, as the shipper can simply refuse to release a container to a trucking company or consolidator. We also find this point dispositive of the Board's contentions with respect to the right of consolidators and trucking companies to control the cargo inside the containers. Unless the shippers turn over the containers, as they ultimately chose not to do in the cases before us, this "right" is without substance
 
 
 [191]
 98 L.R.R.M. at 1277 ("Briefly, these Rules require that Any containers owned or leased by employer-members (of CONASA) * * *." (emphasis added)). See JA(B-HR) 415a. This observation of the NLRB appears to be in conflict both with the terms of the 1974 Rules, See Rule 1(a)(1), Reprinted in Appendix B Infra, and with its earlier determination in Conex, See 221 N.L.R.B. at 960. Containers "used" by CONASA shippers also come under the Rules. The important points here, however, are that petitioners' contentions that the shippers owned or leased the containers at issue are unrefuted and that, in any event, the shippers clearly had "control" over the disposition of the containers
 
 
 [192]
 Thus, in light both of our preceding discussion on the proper formulation of the work in controversy, See text at notes 163-178 Supra, and of the shippers' control over disposition of containers, the Supreme Court's following characterization in Pipefitters is inapplicable to the instant cases: "the union sought to acquire work that it never had and that its employer had no power to give it * * *." 429 U.S. at 530 n.16, 97 S.Ct. at 904 n.16
 
 
 [193]
 29 U.S.C. § 160(e) (1976)
 
 
 [194]
 429 U.S. at 530-531, 97 S.Ct. 891
 
 
 [195]
 See text at notes 133-159 Supra. Also, the District Court's decision in Consolidated Express, Inc. v. New York Shipping Ass'n, 452 F.Supp. 1024 (D.N.J.977), has been the subject of an interlocutory appeal to the Third Circuit, 602 F.2d 494 (3d Cir. 1979), Aff'g in part & rev'g in part 452 F.Supp. 1024
 
 
 [196]
 Respondent's brief (B-HR) at 34 n.20
 
 
 [197]
 See, e.g., petitioner's (CONASA) reply brief (B-HR) at 2
 
 
 [198]
 98 L.R.R.M. at 1277
 
 
 [199]
 537 F.2d at 708
 
 
 [200]
 See text at notes 105-132 Supra
 
 
 [201]
 NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956); See NLRB v. Brown, 380 U.S. 278, 290-292, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)
 
 
 [202]
 In Nos. 77-1735 and 77-1758 intervenor Houff Transfer, Inc. maintains that, because these cases focus on FSL containers while Conex (and No. 78-1510) focuses on CFCL, LTL, and LCL containers, the respective factual backgrounds are distinguishable. Intervenor's brief at 37-40. However, because we find that the Board committed an error of law in both the New York and the Baltimore-Hampton Roads cases, Houff's argument is not relevant
 
 
 [203]
 See Part I Supra
 
 
 [204]
 Id. It hardly requires mention that use of economic force in collective bargaining is fully within the contemplation of the national labor laws. In NLRB v. Insurance Agents International Union, 361 U.S. 477, 489, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960), the Supreme Court stated, "The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." See NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 287, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61 (1972) ("Preventing industrial strife is an important aim of federal labor legislation, but Congress has not chosen to make the bargaining freedom of employers and unions totally subordinate to this goal. When a bargaining impasse is reached, strikes and lockouts may occur."); Air Line Pilots Ass'n International v. CAB, 163 U.S.App.D.C. 451, 454, 502 F.2d 453, 456 (1974), Cert. denied, 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 (1975) (national labor policy rests upon the principle that parties are free to marshal economic resources in resolution of labor disputes, consistent with the rights and prohibitions of labor statutes)
 
 
 [205]
 See generally Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999 (1955)
 
 
 [206]
 Containers that were not stuffed and stripped in compliance with the Rules, however, have been, and doubtless in the future will be, subjected to duplicate stuffing and stripping by ILA labor. Consider one commentator's characterization of ILA behavior that in the past has slowed the rate of innovation:
 There is reason to believe, or at the very least the question must remain open, that the optimum rate in which labor-saving technology is introduced is not the fastest possible rate. To the extent that this is true, union impediments may be considered as not merely obstacles to progress, but as efforts to buy time in which the human costs of change can be softened and made more tolerable.
 Ross, Supra note 7, 21 Lab.L.J. at 419.